Opinion issued May 3, 2007
















In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00524-CV

__________


INTERCONEX, INC. D/B/A INTERDEANINTERCONEX, Appellant


V.


NICK UGAROV, Appellee






On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 2003-68999






OPINION ON REHEARING

 We grant appellant's motion for rehearing. See Tex. R. App. P. 49.3. We
withdraw our August 31, 2006 opinion, substitute this opinion in its place, and vacate
our August 31, 2006 judgment. 

 Appellant, Interconex, Inc. doing business as InterdeanInterconex
("Interconex"), challenges the trial court's judgment entered, after a jury trial on the
sole issue of damages, in favor of appellee, Nick Ugarov, in Ugarov's suit for breach
of contract, negligence, and defamation. In five issues, Interconex contends that there
is legally and factually insufficient evidence to support the required causal nexus
between the events sued upon and Ugarov's damages for past and future lost earnings
and that the trial court erred in denying its motion to compel arbitration, denying its
motion to set aside partial default judgment, excluding Interconex's evidence
contesting the causal link between its conduct and Ugarov's damages and evidence
of its prior settlement with Ugarov, informing the jury that Interconex had admitted
that its conduct caused Ugarov's inability to return to Russia, permitting Ugarov to
read to the jury the allegations from his pleadings, denying Interconex's requested
jury instruction, overruling Interconex's objections to the jury charge, and awarding
Ugarov prejudgment interest.

 We reverse and remand for a new trial on damages.

Factual and Procedural Background


 Ugarov filed suit on December 23, 2003, alleging that in October 2002, he was
relocated by his employer, ChevronTexaco ("Chevron"), from Moscow, Russia to
Houston, Texas and that Chevron hired Cendant Mobility Services Corporation
("Cendant") to handle his relocation. Cendant then "contracted with [Interconex] to
coordinate Ugarov's international move, including the preparation of all documents
and export permits required by the Ministry of Culture of the Russian Federation."
Interconex "inventoried and packed [his] family's possessions . . . prior to the Russian
Customs inspection" and, during the government inspection on October 23, 2002,
Russian authorities confiscated nine of his timepieces, "claiming that they were not
backed by the appropriate export permits." 

 Ugarov further alleged that although Interconex "had full authority to make
decisions regarding the necessity of permits regarding all the property," Interconex
"did not take responsibility for [its] error, but instead attempted to shift the blame to
Ugarov by claiming that he had concealed the timepieces from them during the
packing process." 

 Consequently, after Ugarov arrived in the United States in late October 2002, 
Interconex "informed him that he should not return to Russia because of concerns
over his possible arrest relating to the confiscated property" and "recommended that
[he] wait at least six months before attempting to return to Russia." Ugarov
contended that "[d]ue to the situation with the Russian Ministry of Culture, [he] was
unable to return to Russia, specifically having to abandon an employment opportunity
that presented itself in late 2002," that he "was out of work from the October 2002
move until November 2003," and that "[t]o date, he has neither worked again in
Russia nor earned a salary commensurate with that earned pre-October 2002."

 In his breach of contract claim, Ugarov alleged that he was the third-party
beneficiary of the contract between Cendant and Interconex and that Interconex
breached the contract "by failing to properly pack and inventory [his] goods and by
failing to acquire the proper export permits." In his negligence claim, Ugarov alleged
that Interconex had a duty to exercise ordinary care in packing and moving his
property and that Interconex breached that duty. In his defamation claim, Ugarov
alleged that Interconex published defamatory accusations to both Russian Customs
officials and Chevron that Ugarov attempted to smuggle property out of Russia. 

 On January 7, 2004, Interconex received service of citation and Ugarov's
petition through its registered agent, Will Tiongson, at Interconex's Houston offices,
but it did not file an answer by its February 2, 2004 deadline. After Ugarov filed his
motion for partial default judgment, the trial court, on March 3, 2004, entered partial
default judgment "as to liability" against Interconex. In its judgment, the court found
that Interconex had received service on January 7, 2004 and that Ugarov's damages
were unliquidated.

 The trial court set a damages hearing, but before the hearing, Interconex filed
an answer on April 22, 2004. On June 4, 2004, Interconex filed a motion to set aside
default judgment, attaching Tiongson's affidavit testimony that he "did not receive
service of any papers, documents, citation, or process by any person" in the lawsuit,
but that "if for whatever reason [he] did receive service of any such papers, [he]
would have immediately turned such documents and papers over to the attorneys for
Interconex for their proper handling and legal services." Ugarov responded to
Interconex's motion, asserting that Interconex had failed to offer any evidence of
accident or mistake or a meritorious defense and that the granting of Interconex's
motion would delay the case. 

 On October 15, 2004, Interconex filed an amended motion to set aside default
judgment, in which it asserted that it had never received service in this case. 
Alternatively, Interconex asserted that in the event the court found that Interconex
had received service of the citation and petition, the default judgment should be set
aside under Craddock v. Sunshine Bus Lines, Inc., 134 Tex. 388, 133 S.W.2d 124
(1939). Specifically, Interconex asserted that its failure to answer the lawsuit was not
intentional or the result of conscious indifference, but was due to mistake or accident,
that it had a meritorious defense to Ugarov's claims because none of the activities
giving rise to Ugarov's claims were performed by Interconex employees, and that
setting aside the default judgment would not cause delay or injury to Ugarov. In
support of its amended motion, Interconex filed a second amended affidavit from
Tiongson, in which Tiongson testified that he had not been served, but also testified
that "the signature on the citation [did] appear to be [his] signature, but [he] still
[denied] that [he] received service of citation, or the petiton." He stated that
"assuming that [he] signed the citation, apparently a mistake or accident occurred
either by the process server, or [himself], or perhaps some other employee of either
the process server's company or Interconex" and that "[w]hatever occurred to cause
[him] not to receive a copy of the citation and petition . . . it was a mistake and/or
accident." He also stated that "if [he] had received the citation and petition . . . [he]
would have forwarded it immediately to the company's attorneys" and that "it is [his]
intention to always have any lawsuit with which [he is] served delivered immediately
to the company attorneys, and to have a timely answer filed." In regard to
Interconex's meritorious defense, Tiongson testified that the "services which are the
basis of the claims in . . . this lawsuit may have been provided by Interdean AO, a
Russian company" and that "Interconex has no employees in Russia, nor does
Interconex exercise any control or authority over the employees of Interdean AO." 
 On October 15, 2004, the trial court conducted a hearing on Interconex's
motion to set aside default judgment, and, during the hearing, Tiongson testified that
he did not receive the citation and petition on January 7, 2004. Although Tiongson
agreed that his signature appeared on the citation, he maintained that he did not
receive a copy of the citation and petition. During Ugarov's cross-examination of
him, Tiongson stated that "it is the fact that I signed it, that means I saw the paper and
signed it, but that was-that was it." Tiongson further agreed that somebody handed
the citation to him, that he saw it and signed it, and that there was "no doubt" that it
was his signature that appeared on the citation. After hearing Tiongson's testimony
and the testimony of the process server, who testified that he had served Tiongson,
the trial court found that Interconex had been served as set out in the return. 

 The trial court then instructed Interconex to "proceed with the Craddock v.
Sunshine elements." Interconex again called Tiongson, who testified that as
registered agent for Interconex, when served with papers, he immediately sends them
to Interconex's counsel and that as far as he knows he has "always been [sic] turning
over any legal documents that [he] received" to Interconex's attorney. 

 At the conclusion of the hearing, the trial court denied Interconex's motion and
set a trial on damages for the existing trial date of October 25, 2004. Interconex then
asserted that it had paid a jury fee, and the trial court, pursuant to Interconex's
request, reset the case for a December 13, 2004 trial on damages. On December 1,
2004, Interconex filed an amended answer and a motion to compel arbitration and
stay judicial proceedings, which the trial court denied. Interconex then filed a motion
to reconsider, which, after a hearing, the trial court denied. 

 On December 13, 2004, the trial court conducted a jury trial on the sole issue
of damages and, based on the default judgment, submitted the following single
question to the jury: "What sum of money, if any, if paid now in cash, would fairly
and reasonably compensate Nick Ugarov for his damages, if any, that resulted from
[his] inability to return to Russia?" (emphasis added). The only elements of damages
submitted to the jury were "[l]ost earnings that were sustained in the past" and "[l]ost
earnings that in reasonable probability will be sustained in the future." The jury
awarded Ugarov $455,000 in "past lost earnings" and $85,000 in "future lost
earnings," and the trial court rendered a final judgment in favor of Ugarov based on
the jury's verdict.

Legal Sufficiency

 In its first issue, Interconex argues that the trial court's judgment should be
reversed and that judgment should be rendered that Ugarov take nothing because
there is legally insufficient evidence of the required causal nexus between the events
sued upon and the damages claimed. Interconex asserts that the default judgment
established only that the confiscation of Ugarov's timepieces was caused by
Interconex's breach of contract, negligence, and defamatory statements, but that it did
not establish the causal connection between the confiscation of the timepieces and
Ugarov's inability to return to Russia or his loss of an employment opportunity. 
Interconex further asserts that Ugarov failed to present any evidence of the causal
connection between the confiscation of the timepieces and the loss of Ugarov's
employment opportunity. Interconex also argues that there is legally insufficient
evidence to support the jury's award for Ugarov's past and future lost earnings
because its damages findings are supported only by Ugarov's conclusory testimony
that amounts to nothing more than sheer conjecture and speculation. 

 We will sustain a legal sufficiency or "no-evidence" challenge if the record
shows one of the following: (1) a complete absence of evidence of a vital fact, (2)
rules of law or evidence bar the court from giving weight to the only evidence offered
to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. 
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal
sufficiency review of the evidence, a court must consider evidence in the light most
favorable to the verdict and indulge every reasonable inference that would support
it. Id. at 822. If the evidence allows only one inference, neither jurors nor the
reviewing court may disregard it. Id. However, if the evidence at trial would enable
reasonable and fair-minded people to differ in their conclusions, then jurors must be
allowed to do so. Id. A reviewing court cannot substitute its judgment for that of the
trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. 
Id. 

 Although a default judgment conclusively establishes a defendant's liability,
i.e., the "causal nexus between the conduct of the defendant and the event sued
upon," a "defaulting defendant does not admit that the event sued upon caused any
of the plaintiff's alleged injuries." Morgan v. Compugraphic Corp., 675 S.W.2d 729,
732 (Tex. 1984). Proving that the event sued upon actually caused the plaintiff's
alleged injuries "is part and parcel of proving the amount of damages to which the
plaintiff is entitled." Id. 

 Here, the trial court, based on its misapplication of Morgan, as we explain in
more detail below in our discussion of Interconex's fourth issue, instructed the jury
that it was undisputed that Ugarov was unable to return to Russia, lost an employment
opportunity, and did not earn as much as he otherwise would have earned. Interconex
argues that because Ugarov "was under the mistaken impression that he only had to
show the damages he lost as a result of his inability to return to Russia for
employment, there understandably is no evidence that any of [Interconex's] conduct
caused [Ugarov's] inability to return to Russia."

 However, the record reveals that Ugarov, in his testimony, detailed his prior
work history, including his significant earnings history, and explained that his ability
to speak English and Russian made him a valuable employee in certain markets. 
Ugarov explained that in the fall of 2002, he was offered a job as a project manager
for the "Reforma Project," which involved managing the development of a new
planned community in Russia "from the beginning through the life of the project." 
Ugarov noted that Reforma was a new development aiming to bring Canadian
technology for prefabricated housing to Russia and to build a planned community of
single family dwellings in Russia. Reforma made him an offer of "$300,000 [per
year] after taxes and five percent bonus or commission," "the anticipated life of the
project was from three to five years," and Ugarov was supposed to start the job on
January 1, 2003. Ugarov had agreed to accept the job, and he and a principal of
Reforma had agreed to terms, including the salary that he would receive. 

 Ugarov further explained that he could not return to Russia and that he did not
start the job as scheduled because "I was told that . . . I could be arrested if I would
show in the country . . . any time soon. . . . [T]hey told me with time eventually it
may be removed from your record, but . . . they said at least for six months, don't go
because you can be arrested." Ugarov tried to resolve the situation by talking with
representatives of Chevron and Interconex, and he asked Reforma to hold the position
for him. Reforma agreed to hold his job open until April or March 2003, but Ugarov
finally lost the job because Reforma could not wait any longer. Consequently,
Ugarov began looking, "using all means that were available," for another job that was
not in Russia, and he found a job with an oil company in Kiev, Ukraine. He began
work for this company in November 2003, worked for approximately one and one-half of one month in 2003, and earned "around $15,000" as compared to the $300,000
he would have earned with Reforma. Ugarov stated that, in 2003, he lost $285,000
in earnings as a result of losing the Reforma job. In 2004, Ugarov earned $130,000
from his job in the Ukraine as compared to the $300,000 he would have earned with
Reforma, and lost $170,000 in earnings as a result of losing the Reforma job. In
2005, Ugarov would have earned $130,000 from his job in the Ukraine as compared
to the $300,000 he would have earned with Reforma, and he would lose another
$170,000 in earnings in 2005 as a result of losing the Reforma job. (1) 

 During cross-examination, Ugarov reiterated that he could not return to Russia
for a period of approximately six months once the criminal case had been opened
against him. Interconex told him that it had "official word" from Russian Customs
that a criminal case had been opened against him and that he should wait to return to
Russia until the "dust settled." Ugarov had consulted with two attorneys and
concluded that he could not risk returning to Russia to take the Reforma job. On
redirect examination, Ugarov confirmed that Reforma was still in business as of the
date of trial and was still doing what he had originally been hired to do. Ugarov also
stated that the real estate market in Russia was booming from the date he had been
offered the job up until the time of trial, Reforma had a business plan "based on the
projected number of units" it intended to sell, and Reforma had made
accommodations to operate for at least one year without profit. Ugarov also
introduced into evidence a copy of two emails from Dmitri Gudkov, who Ugarov
contended was a representative from Interconex or one of its affiliates, stating that
Interconex had been informed by a Russian Customs employee that a "legal case" had
been opened against Ugarov. 

 Thus, even though the trial court misapplied Morgan, as we explain below,
Ugarov presented evidence supporting his claims that, as a result of Interconex's
breach of contract, negligence, and defamation, a criminal case was opened against
him in Russia, causing him to be unable to return to Russia and to lose his job at
Reforma. Ugarov testified that he had accepted a specific position with Reforma, he
and Reforma agreed to certain terms of employment, including salary and duration,
he lost this job as a result of his inability to return to Russia, and Reforma remained 
in business and continued to perform the job for which he had ben selected. Ugarov
further testified that he had sought alternative employment, but it offered significantly
lower compensation than Reforma. Moreover, Ugarov provided testimony
concerning the specific salary he would have received at Reforma compared to the
salary he received with his job in the Ukraine. 

 In sum, Ugarov's testimony, consisting of statements of affirmative facts, was
not "conclusory." (2) Although we agree with Interconex that the default judgment did
not establish the causal connection between its conduct and Ugarov's inabilty to
return to Russia or his loss of an employment opportunity, Ugarov did present
evidence on these issues. Accordingly, we hold that Ugarov presented legally
sufficient evidence to support the jury's damages findings. 

 Interconex also contends in a sub-issue that Ugarov failed to comply with
section 18.091 of the Texas Civil Practice and Remedies Code, which provides,

 If any claimant seeks recovery for loss of earnings, loss of earning
capacity, loss of contributions of a pecuniary value, or loss of
inheritance, evidence to prove the loss must be presented in the form of
a net loss after reduction for income tax payments or unpaid tax liability
pursuant to any federal income tax law.


Tex. Civ. Prac. & Rem. Code Ann. § 18.091 (Vernon Supp. 2006). Interconex
asserts that Ugarov's testimony that "I would still have to pay taxes in the United
States no matter where I earn the money," establishes that Ugarov's testimony
concerning his "lost earnings" failed to comply with section 18.091. It argues that
because Ugarov failed to meet his burden of proving net loss, we should reverse and
render a take nothing judgment in favor of Interconex. Ugarov asserts that he
substantially complied with section 18.091 and, alternatively, that section 18.091 is
unconstitutional. 

 However, we need not address these arguments. Interconex did not object to
the trial court's jury instruction not to consider taxes in regard to answering the
questions that would be submitted in the charge, and it did not specifically object to
the damages question on the ground that it failed to comply with section 18.091. See
Tex. R. Civ. P. 272, 274. Accordingly, Interconex has waived this sub-issue for our
review. See Tex. R. App. P. 33.1.

 We overrule Interconex's first issue.

Arbitration

 In its second issue, Interconex argues that the trial court abused its discretion
in denying its motion to compel arbitration because there is no evidence that it
intentionally waived its right to arbitration or that Ugarov was prejudiced by any
delay in Interconex's request for arbitration. Ugarov asserts that the parties never
agreed to arbitrate, that Interconex is not a party to the arbitration agreement, that the
"Arbitration Court in Moscow" referred to in the arbitration agreement does not
conduct arbitration, and that Interconex waived its right to arbitration.

 "A party seeking to compel arbitration has the initial burden to establish the
arbitration agreement's existence and to show that the claims asserted against it fall
within the arbitration agreement's scope." Williams Indus., Inc. v. Earth Dev. Sys.
Corp., 110 S.W.3d 131, 134 (Tex. App.--Houston [1st Dist.] 2003, no pet.) (citing 
Mohamed v. Auto Nation USA Corp., 89 S.W.3d 830, 835 (Tex. App.--Houston [1st
Dist.] 2002, no pet.)). If the party seeking to compel arbitration carries its initial
burden, the party resisting arbitration must then present evidence on any defenses to
the arbitration agreement. Id. 

 Waiver is the intentional relinquishment of a known right or intentional
conduct inconsistent with claiming that right. Jernigan v. Langley, 111 S.W.3d 153,
156 (Tex. 2003); In re Citigroup Global Mkts, Inc., 202 S.W.3d 477, 481 (Tex.
App.--Dallas 2006, combined appeal and original proceeding [mand. pending]). As
with any contractual right, a party may waive its right to arbitration. Williams Indus.,
110 S.W.3d at 135. However, because public policy favors arbitration, there is a
strong presumption against finding a waiver of the right to arbitration, and any doubts
regarding waiver are resolved in favor of arbitration. In re Bruce Terminix Co., 988
S.W.2d 702, 704, 705 (Tex. 1998). Whether waiver occurs "depends on the
individual facts and circumstances of each case." Williams Indus., 110 S.W.3d at
135. Waiver may be express or implied. Id.; In re Citigroup Global Mkts, Inc., 202
S.W.3d at 481. A party may waive its right to arbitration "by expressly indicating
that it wishes to resolve the case in a judicial forum." In re Citigroup Global Mkts,
Inc., 202 S.W.3d at 481. Alternatively, a party may waive its right to arbitrate "by
taking an action inconsistent with that right to the opposing party's prejudice." Id.
at 481-82. Thus, waiver will be found only when (1) the party seeking arbitration has
substantially invoked the judicial process and (2) the party opposing arbitration
suffers actual prejudice as a result. Williams Indus., 110 S.W.3d at 135. 

 An attempt to resolve the merits and still retain the right to arbitration is clearly
impermissible. In re Citigroup Global Mkts, Inc., 202 S.W.3d at 482. Substantially
invoking the judicial process has also been described as "taking specific and
deliberate actions, after the suit's filing, that are inconsistent with the right to
arbitrate." Williams Indus., 110 S.W.3d at 135 (citing Sedillo v. Campbell, 5 S.W.3d
824, 827 (Tex. App.--Houston [14th Dist.] 1999, no pet.)). Examples include
moving for summary judgment or seeking a final resolution of the dispute. Williams
Indus., 110 S.W.3d at 135. A party may establish prejudice by showing that the
movant acquired access to information in the court proceedings that is not
discoverable in arbitration. In re Bruce Terminix Co., 988 S.W.2d at 704; Williams
Indus., 110 S.W.3d at 135. A party may also establish prejudice by showing that it
incurred costs and fees due to the movant's actions or delay. Williams Indus., 110
S.W.3d at 135; Pennzoil Co. v. Arnold Oil Co., 30 S.W.3d 494, 499-500 (Tex.
App.--San Antonio 2000, no pet.). Typically, a party must present evidence of
prejudice, and may not rely on general allegations of harm. See In re Oakwood
Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999); Pennzoil Co., 30 S.W.3d at
499. 

 Here, the trial court did not directly address whether a valid arbitration
agreement existed, and instead limited its findings to whether, if such an agreement
existed, Interconex waived its right to compel arbitration. We review the trial court's
finding of waiver de novo. Tex. Residential Mortgage, L.P. v. Portman, 152 S.W.3d
861, 863 (Tex. App.--Dallas 2005, no pet.); The Courage Co. v. The Chemshare
Corp., 93 S.W.3d 323, 337 (Tex. App.--Houston [14th Dist.] 2002, no pet.). (3) 

 In regard to whether Interconex impliedly waived its right to arbitration, i.e.,
whether it acted inconsistent with its right to arbitration, we note that Interconex was
served through its registered agent on January 7, 2004 and that the trial court entered
a partial default judgment "as to liability" against Interconex on March 3, 2004. 
Although Interconex filed a motion to set aside default judgment on June 2, 2004, it
did not set a hearing or file its amended motion to set aside default judgment, which
included more extensive allegations, until October 15, 2004. At the conclusion of the
October 15, 2004 hearing, the trial court denied Interconex's motion and initially
stated that it would set the damages trial for the existing trial date, October 25, 2004. 
Interconex then asserted that it had paid a jury fee and was entitled to a jury trial on
damages. The court, pursuant to Interconex's request, then reset the damages trial for
December 13, 2004.

 Interconex waited until December 1, 2004, ten days prior to the damages trial,
to file its motion to compel arbitration, asserting for the first time that the case should
be sent to arbitration. In its motion to compel arbitration, Interconex asserted that to
handle the moving of his personal belongings, Ugarov had entered into a written
contract, which contained an arbitration agreement. Interconex attached the contract
containing the arbitration agreement, and asserted that Ugarov's allegations were
within the subject matter of the agreement. 

 On December 2, 2004, Ugarov filed a response, asserting, among other things,
that the arbitration agreement was no longer valid and that Interconex had delayed in
asserting its right to arbitration. On December 3, 2004, the trial court signed an order
denying Interconex's motion stating "that, by failing to file an answer before default
judgment was granted, [Interconex] waived its right, if any, to insist on arbitration." 
The court also stated in its order that it made no finding "as to whether or not
[Interconex] would have had such right if [Interconex] had chosen to answer the
lawsuit in a timely manner." 

 Here, the merits of the case regarding Interconex's liability had been
established when the trial court denied Interconex's motion to set aside the default
judgment. At that point, Interconex asserted that it had paid a jury fee and was
entitled to a jury trial on damages, and the trial court reset the case for a trial on
damages. Interconex acted inconsistently with its right to arbitrate by failing to
timely answer the lawsuit after it had been served through its registered agent and by
failing to move for arbitration before its liability had been established. Moreover, it
acted inconsistently with its right to arbitrate when it requested that the case be reset
from its existing October trial date to a December 13, 2004 jury trial on the issue of
damages. It did not file its motion to compel arbitration until shortly before the jury
trial, which Interconex had specifically requested and caused to be set in December
2004. Accordingly, we conclude that Interconex had substantially invoked the
judicial process before it moved to compel arbitration.

 In regard to whether Ugarov suffered actual prejudice as a result of
Interconex's invocation of the judicial process, we note that Ugarov, in his response
to Interconex's motion to compel arbitration, attached an affidavit from his counsel,
who testified that the parties were only four days away from a jury trial, that Ugarov
had gone to the expense of flying from Kiev, Ukraine to Houston for the sole purpose
of attending the jury trial on damages that had been requested and set by Interconex,
that he and Ugarov had been spending time getting ready for the jury trial, and that
Ugarov had been prejudiced by Interconex's utilization of the discovery process
before requesting arbitration because he did not believe that the arbitration in Russia
would require the advanced production of documents. In its order denying
Interconex's motion to reconsider, the trial court found that Interconex's delay in
seeking arbitration caused prejudice to Ugarov. Thus, Ugarov established that he had
incurred costs and expended time in preparation for the jury trial on damages. 
Accordingly, we conclude that Ugarov demonstrated that Interconex's invocation of
the judicial process caused him to suffer actual prejudice. 

 In support of its argument that the judgment should be set aside, Interconex
cites Home Club, Inc. v. Barlow, 818 S.W.2d 192, 193 (Tex. App.--San Antonio
1991, orig. proceeding). In Barlow, the court held that a party who had contested
jurisdiction and sought to set aside default judgments had taken only a defensive
posture and thus had not substantially invoked the judicial process. Id. Importantly,
in Barlow, the court set aside the default judgments that had originally been entered. 
 Id. The situation presented in the instant case is distinguishable. Here, not only did
Interconex fail to timely file an answer, the trial court found that Interconex had
received service and denied Interconex's motion to set aside the default judgment
filed pursuant to Craddock. Thus, at the time that Interconex sought to compel
arbitration, the trial court had already entered, and affirmed, its default judgment that
Interconex was liable for the events sued upon in Ugarov's petition. See Gen. Star
Nat'l Ins. Co. v. Administratia Asigurarilor de Stat, 289 F.3d 434, 438 (6th Cir. 2002)
(holding that defendant who did not assert right to arbitrate until seventeen months
after receiving actual notice of lawsuit and after entry of default judgment "remained
idle while [the plaintiff] incurred the costs associated with this action" waived any
right to arbitrate); State ex rel. Barden and Robeson Corp. v. Hill, 539 S.E.2d 106,
112 (W.Va. 2000) (stating that unless defendant is able to show good cause for
default, it has waived its right to assert arbitration as affirmative defense and that
"[u]nexcused conduct that results in the entry of a default judgment is no less of an
implicit waiver of a right to arbitration than any other procedural forfeiture"). Here,
it simply cannot be said, as in Barlow, that at the time Interconex filed its motion "the
litigation was still in its infancy." Id. Accordingly, we hold that Interconex waived
any right to arbitration that it may have had. 

 We overrule Interconex's second issue.

Default Judgment

 In its third issue, Interconex argues that the default judgment should be set
aside and that the case should be remanded because Ugarov adduced no evidence of
delay or prejudice. Interconex asserts that the trial court expressly found that it had
met the first and second elements of Craddock and that the only issue on appeal in
regard to the default judgment "concerns the trial court's implied finding that
[Ugarov] met his burden of proving undue delay or injury." Ugarov disputes that the
trial court found that Interconex met the first two elements of Craddock, and
challenges all three elements of Craddock on appeal. (4)

 A default judgment should be set aside when the defendant establishes that (1)
the failure to answer was not intentional or the result of conscious indifference, but
the result of an accident or mistake, (2) the motion for new trial sets up a meritorious
defense, and (3) granting the motion will occasion no undue delay or otherwise injure
the plaintiff. Craddock, 133 S.W.2d at 126. "While trial courts have some measure
of discretion in the matter, as, in truth, they have in all cases governed by equitable
principles, it is not an unbridled discretion to decide cases as they might deem proper,
without reference to any guiding rule or principle." Id. Thus, a trial court's decision
to overrule a motion to set aside a default judgment and grant a new trial is subject
to review for abuse of discretion. Old Republic Ins. Co. v. Scott, 873 S.W.2d 381,
382 (Tex. 1994).

 As the defendant seeking to set aside the default judgment, Interconex
presented Tiongson, who testified,

 [Counsel]: And when you are served with papers as registered agent,
what do you do with those papers?


 [Tiongson]: Well, knowing that these are important, very important
documents, I immediately send them over to our attorney
and--I copy or give the original to the president of the
company or . . . whoever it is . . . that is the head of the
company at that time. " 


 . . . .


 [Counsel]: And as far as you know, any papers that you have received
as registered agent for Interconex, have you turned those
over to the president of the company and to the attorney for
the company?


 . . . .


 [Tiongson]: As far as I know, yes, I've always been turning over any
legal documents that I received as registered agent for
Interconex to our attorney and to the president of the
company. 


Interconex also refers to Tiongson's affidavit testimony that I did not receive service of any papers, documents, citation, or
process by any person in the . . . lawsuit, but if for whatever reason I did
receive service of any such papers, I would have immediately turned
such documents and papers over to to the attorneys for Interconex, Inc.
for their proper handling and legal services. 


 The affidavit containing the above testimony was admitted into evidence at the
beginning of the hearing. However, later in the hearing, Ugarov presented
substantive objections to Tiongson's affidavit testimony. Specifically, Ugarov
objected to Tiongson's testimony that "assuming that I signed the citation, apparently
a mistake or accident occurred," that "whatever occurred to cause me not to receive
a copy of the citation and petition . . . it was a mistake and/or accident," that "if I had
received the citation and petition . . . I would have forwarded it immediately to the
company's attorneys," and that it is his intention "to always have any lawsuit with
which I am served delivered immediately to the company attorneys, and to have a
timely answer filed." The trial court sustained Ugarov's objections to this testimony. (5) 
 Interconex did not offer any additional evidence related to the issues of
accident or mistake, and Interconex does not challenge the trial court's rulings on
those objections on appeal. Furthermore, neither the president of Interconex nor
counsel for Interconex testified as to whether they had received the papers in this
lawsuit from Tiongson and whether they had, by accident or mistake, failed to file an
answer to the lawsuit. 

 The Texas Supreme Court has recently stated that to establish accident or
mistake a party does not necessarily have to present an affidavit from the person who
lost the papers describing how the papers were lost because, logically, "[p]eople often
do not know where or how they lost something--that is precisely why it remains
'lost.'" Fidelity & Guar. Ins. Co. v. Drewery Constr. Co., 186 S.W.3d 571, 575 (Tex.
2006). Furthermore, the court has "often set aside default judgments when papers
were misplaced, though no one knew precisely how." Id. (citing Old Republic Ins.
Co., 873 S.W.2d at 382; Estate of Pollack v. McMurrey, 858 S.W.2d 388, 391 (Tex.
1993); Hanks v. Rosser, 378 S.W.2d 31, 32, 36 (Tex. 1964)). Finally, while "[a]n
excuse need not be a good one to suffice," "a conclusory statement that documents
were 'lost' must generally be supported by some explanation from the person most
likely to have seen them, or of the efforts made to find them." Id. at 575-76.

 For example, in Fidelity & Guaranty Insurance Company, the defaulting
defendant provided affidavit testimony that its registered agent received the citation
and petition, and that computer records indicated that, contrary to the ordinary course
of business, the registered agent did not forward an electronic scan of the documents
to the defendant's affiliate. 186 S.W.3d at 575. The affiliate's agent also averred that
she never received the documents. Id. The supreme court rejected the contention that
the defendant's affidavits were general or conclusory, instead finding that they
"detail[ed] the procedures for handling service papers in general and what is known
about [the plaintiff's] papers in particular" and that "[i]n the case of electronic
records, they explain[ed] precisely where the breakdown occurred . . . ." Id. 

 Similarly, in Old Republic, the defaulting defendant presented affidavit
testimony from a claims handler assigned to investigate a lost citation, who testified
that the defendant had transferred claim files to another facility around the time that
the citation was served and that to the best of her knowledge, the citation "was
inadvertently included among the transferred files and misplaced." 873 S.W.2d at
382. The supreme court found, based on this evidence, that Old Republic satisfied
its burden to set forth facts establishing that its failure to answer was mistaken or
accidental and not the result of conscious indifference. Id.; cf. Holt Atherton Indus.,
Inc. v. Heine, 835 S.W.2d 80, 83 (Tex. 1992) (finding affidavit that merely stated that
"the failure of the corporation to file an answer herein was due to accident and
mistake due to the complete lack of knowledge of any knowledge as to the facts or
circumstances" involved in case provided "merely a conclusory allegation" with "no
explanation of the nature of the mistake"). 

 Here, Tiongson contended, even after he admitted that there was "no doubt"
that his signature appeared on the citation, that he had not been properly served in this
lawsuit. After the trial court apparently rejected Tiongson's testimony and found that
he had been served, Tiongson offered testimony regarding how he generally performs
the duties of a registered agent, but there was no testimony establishing whether he
had actually forwarded the papers in this lawsuit to the appropriate person at
Interconex or what may have happened to the papers in this lawsuit. The only
evidence concerning Interconex's receipt of papers in this lawsuit was Tiongson's
testimony at the hearing that, "[a]s far as [he knew]," he had "always been turning
over any legal documents" to Interconex's attorney and president. 

 However, even if Tiongson's testimony could be considered sufficient to
support a finding that Tiongson, in the ordinary course, forwarded the papers in this
lawsuit to the Interconex's president and counsel, neither the president nor the
counsel testified whether or not they had received the papers, whether or not such
papers were lost on their way to their offices, whether or not these papers had been
misplaced by representatives in their office, and, importantly, whether or not
Interconex failed to file an answer to the lawsuit through a mistake or accident. See
Holt Atherton Indus., 835 S.W.2d at 83 ("When a defendant relies on his agent to file
an answer, he must demonstrate that both he and his agent were free of conscious
indifference."). Additionally, even assuming that we could consider Tiongson's
affidavit testimony that, if he had received the legal papers, he "would have
forwarded [them] immediately to the company's attorneys," and that it was his
intention "to always have any lawsuit . . . delivered immediately to the company
attorneys, and to have a timely answer filed," this testimony simply addresses
Tiongson's forwarding of papers to others at Interconex who would be responsible
for filing an answer, none of whom testified. It does not address whether such papers
were lost after being forwarded to these agents or employees of Interconex, or
whether those agents or employees ignored the papers and did not file an answer. Unlike the evidence presented in Fidelity & Guaranty Insurance Company,
here there is no evidence concerning the papers in this lawsuit and there is no
explanation of where the "the breakdown occurred." Simply put, although Interconex
forcefully argued that, assuming it had been served, its failure to file an answer was
not intentional or the result of conscious indifference but instead was due to accident
or mistake, Interconex failed to offer any evidence on the first Craddock element. 
Accordingly, we hold that the trial court did not abuse its discretion in denying
Interconex's motion to set aside default judgment. Having so held, we need not
address whether Interconex satisfied the second and third elements of Craddock. 

 We overrule Interconex's third issue.

Trial on Damages

 In its fourth issue, Interconex contends, among other things, that the trial court
erred in excluding Interconex's evidence contesting the causal link between its
conduct and Ugarov's damages, informing the jury that Interconex had admitted that
its conduct caused Ugarov's inability to return to Russia, permitting Ugarov to read
to the jury allegations from his pleadings, and overruling Interconex's objections to
the jury charge. 

 Based on the default judgment, the trial court read the following paragraph to
the jury at the commencement of voir dire in the damages trial:

 Plaintiff was employed by ChevronTexaco and was relocated in
October 2002 from Moscow, Russia to Houston, Texas. Defendant
failed to obtain export permits for nine watches belonging to Plaintiff
and as a result, the watches were confiscated by Russian authorities. 
After Plaintiff returned to the United States, Defendant informed the
Plaintiff that he should not return to Russia for at least six months
because of concerns regarding Plaintiff's possible arrest relating to the
confiscated property. Plaintiff lost an employment opportunity because
of this problem and did not earn as much as he otherwise would have
earned after October 2002. The jury will be asked to decide only
questions about the amount of damages. The Defendant has already
admitted liability for the acts alleged in Plaintiff's petition.


(emphasis added).

 The trial court also permitted Ugarov to read to the jury the following statement
as "undisputed fact" during the presentation of his evidence in the damages trial:

 In October 2002, Ugarov was relocated by his former employer,
[Chevron], from Moscow, Russia to Houston, Texas. . . . [Chevron]
hired [Cendant] to handle Ugarov's relocation. [Cendant] subsequently
contracted with [Interconex] to coordinate Ugarov's international move,
including the preparation of all documents and export permits required
by the Ministry of Culture of the Russian Federation. [Interconex] held
a power of attorney executed by Ugarov relating to all aspects of moving
his property. [Interconex] inventoried and packed Ugarov's family
possessions at his Moscow apartment for a two-day period prior to the
Russian customs inspection.


 During the government inspection which occurred on or about
October 23, 2002, Russian authorities confiscated nine timepieces
claiming that they were not backed by the appropriate export permits. 
Nonetheless, when the nine unpermitted watches were discovered by
Russian Customs officials at the inspection in October 2002,
[Interconex] representatives did not take responsibility for their error but
instead attempted to shift the blame to Ugarov by claiming that he had
concealed the timepieces from them during the packing process. . . .
[Interconex's] false accusation as to Ugarov's attempt to conceal the
watches and thus smuggle them out of the country were communicated
not only to Russian custom officials, but ultimately also to Ugarov's
former employer, [Chevron].


 After Ugarov's return to the United States in late October 2002,
[Interconex] representatives informed him that he should not return to
Russia because of concerns over his possible arrest relating to the
confiscated property. . . . [Interconex] officials recommended that
Ugarov wait at least six months before attempting to return to Russia.


 Ugarov is an engineer by training whose career has evolved into
business management. Prior to October 2002, he worked for 25 years
coordinating business projects with various Russian and American
entities. . . . Indeed, his Russian business experience and his contacts
within his native country are essential components to Ugarov
maintaining his livelihood.


 Due to the situation with the Russian Ministry of Culture, Ugarov
was unable to return to Russia specifically having to abandon an
employment opportunity that presented itself in late 2002. Ugarov was
out of work from the October 2002 move until November 2003. To
date[,] he has neither worked again in Russia [n]or earned a salary
commensurate with that earned pre-October 2002.


 Ugarov was the third party beneficiary of the above mentioned
contract between [Cendant] and [Interconex] in that the contract was
made for his benefit and the contracted parties intended for him to
benefit from such contract. Not only did he lose possession of the nine
timepieces, but because he was under threat of arrest and therefore
unable to return to Russia, he also has lost valuable employment
opportunities.


(emphasis added).

 At the conclusion of trial, over Interconex's objection, the trial court submitted
the following question to the jury: "What sum of money, if any, if paid now in cash,
would fairly and reasonably compensate Nick Ugarov for his damages, if any, that
resulted from the Plaintiff's inability to return to Russia?" (emphasis added). Thus,
pursuant to the trial court's rulings, the jury was instructed throughout the damages
trial that Ugarov, in fact, could not return to Russia and that, in fact, he lost a job as
a result of being unable to return to Russia. The jury was then asked, in the sole
question in the charge, to award Ugarov damages based on the "undisputed" fact that
he could not return to Russia and lost a job as a result 

 The complaints raised by Interconex in its fourth issue largely relate to the
issue of what facts are established by a default judgment, and both parties cite the
Texas Supreme Court's decision in Morgan as controlling authority. See Morgan,
675 S.W.2d at 732. In Morgan, an employee brought suit for negligence and strict
liability for injuries sustained as a result of inhaling chemical fumes emitted from a
typesetting machine in her office. Id. at 730. The employee had alleged that
Compugraphic's manufacturing and installing of a defective typesetting machine or,
alternatively, its negligent installation of the typesetting machine resulted in the
release of chemical fumes in her office, "causing her a variety of injuries." Id. at 730,
732. Compugraphic failed to file an answer, and the trial court rendered default
judgment against it. Id. at 730. The supreme court, noting that "Compugraphic's
default did not establish that the release of chemical fumes caused [the employee] any
injuries," stated that the employee "had the burden of presenting competent evidence
of a causal nexus between the release of chemical fumes and her alleged injuries." 
Id. at 733. The court emphasized that although the default established that the
machine was leaking fumes, the employee, as proof of her injuries, presented
evidence showing that she was working within inches of the machine and that she had
experienced breathing and swelling problems and other physical symptoms. Id. 
Based on this evidence, the court concluded that the trier of fact could have properly
inferred that the release of fumes "caused [the employee] to suffer injuries." Id. 
Thus, the default in Morgan established only that fumes were released from the
machine, either through Compugraphic's negligence or through a manufacturing
defect, but it did not establish that the employee was exposed to the fumes in a
sufficient nature to cause her personal injuries; the employee was required to present
evidence of these facts. Id. In sum, the facts established by the default in Morgan
appear to have been more closely related to Compugraphic's conduct rather than any
injury to the employee.

 The supreme court, in affirming the default judgment, explained that, in a
personal injury case, there are "two distinct aspects of causation." Id. at 731. It
further explained that, "[i]n a personal injury case, the plaintiff typically alleges that
the defendant's conduct caused an event--an automobile accident, a fall, or in this
case, the release of chemical fumes--and that this event caused the plaintiff to suffer
injuries for which compensation in damages should be paid." Id. Thus, the supreme
court concluded that a plaintiff must establish two causal nexuses in order to be
entitled to recovery: "(a) a causal nexus between the defendant's conduct and the
event sued upon; and (b) a causal nexus between the event sued upon and the
plaintiff's injuries." Id. at 731. 

 The first nexus, which "relates to the liability portion of [a] plaintiff's cause of
action," is the nexus admitted by default. Id. at 732. As noted above, liability, as
used in this context, means the "legal responsibility for the event upon which suit is
based." Id. at 732. In regard to the second nexus, the court noted,

Whether the event sued upon caused any injuries to the plaintiff is
another matter entirely. The causal nexus between the event sued upon
and the plaintiff's injuries is strictly referable to the damages portion of
the plaintiff's cause of action. Even if the defendant's liability has been
established, proof of this causal nexus is necessary to ascertain the
amount of damages to which the plaintiff is entitled. This is true
because the plaintiff is entitled to recover damages only for those
injuries caused by the event made the basis of the suit; that the defendant
has defaulted does not give the plaintiff the right to recover for damages
which did not arise from his cause of action.


Id. (emphasis added). The court explained that "a judgment taken by default admits
all allegations of fact set out in a petition, except for the amount of damages," but also
that "[p]roving that the event sued upon caused the plaintiff's alleged injuries is part
and parcel of proving the amount of damages to which the plaintiff is entitled." (6) Id.
(emphasis added); see also Kirkpatrick v. Mem'l Hosp. of Garland, 862 S.W.2d 762,
772-74 (Tex. App.--Dallas 1993, writ denied). 

 In accord with Morgan, we agree that the default in this case established that
Interconex failed to obtain the proper export permits, falsely accused Ugarov of
concealing the timepieces and attempting to smuggle them out of the country, and
communicated these false accusations to Russian Customs officials and Ugarov's
former employer. These facts relate to the liability portion of Ugarov's suit. 

 However, the default judgment did not establish that Ugarov was unable to
return to Russia or, more significantly, that Ugarov lost a specific job for which he
had been hired, which are facts related to the second causal nexus recognized in
Morgan. 675 S.W.2d at 732-33. Even though the default in Morgan established that
a negligently installed or defective machine released chemical fumes in the
employee's office, the employee still had to offer evidence as to her proximity to the
release of the fumes and that she actually sustained personal injuries as a result of the
exposure. Id. at 733. There, the employee did not merely prove up her medical bills
or present evidence as to the extent of her personal injuries. Id.; see also Kirkpatrick,
862 S.W.2d at 772 ("Although the default establishes liability, the plaintiff must
prove the causal nexus between the event sued upon and his injuries as part of the
proof to determine the amount of damages a plaintiff may recover."). Rather, she
offered evidence of "a sequence of events" permitting the trier of fact to properly
infer "that the release of chemical fumes from the typesetting machine caused [her]
to suffer injury." Morgan, 675 S.W.2d at 733.

 Similarly, in this case, although the default judgment established that
Interconex failed to obtain the proper permits and defamed Ugarov to both his
employer and Russian Customs officials, it did not establish, as "undisputed" facts,
that Ugarov was unable to return to Russia and that he lost a specific job opportunity
for which he had been hired. See Kirkpatrick, 862 S.W.2d at 773 (stating that
defaulting defendant has right to be heard and participate and is entitled to present
evidence by cross-examining plaintiff's witnesses or presenting own witnesses to
show that event made basis of plaintiff's suit did not cause plaintiff's injuries). 

 Here, under the trial court's interpretation of Morgan, the sole issue at the
damages hearing was determining the exact amount of Ugarov's damages by
calculating the difference between the amount he would have earned at a job with
Reforma with the amount he actually earned in alternative employment. Thus, the
judgment was necessarily founded upon the presumption that Ugarov had lost a job
for which he was entitled to be compensated, not on evidence of a nexus between the
events sued upon and Ugarov's damages. 

 Accordingly, we hold that the trial court erred in instructing the venire at the
beginning of trial that it was undisputed that Ugarov was unable to return to Russia,
lost a job opportunity, and did not earn as much as he otherwise would have earned. 
The trial court also erred in permitting Ugarov to present to the jury, as undisputed
facts, that he was not able to return to Russia and that he lost a job opportunity. The
trial court further erred in overruling Interconex's objections to the charge and
submitting a jury question stating, as undisputed fact, that Ugarov was "unable to
return to Russia." 

 We also hold that the trial court abused its discretion in making impermissible
comments on the weight of the evidence in instructing the jury that the default
judgment established that Ugarov could not return to Russia and lost a valuable job
opportunity and in submitting in the jury question, as undisputed fact, that Ugarov
was unable to return to Russia. See H.E. Butt Grocery Co. v. Bilotto, 985 S.W.2d 22,
24 (Tex. 1998) (stating that trial court makes a "direct comment on the weight of the
evidence" if it submits issue "suggest[ing] to the jury the trial court's opinion on the
matter"); In re D.R., 177 S.W.3d 574, 581 (Tex. App.--Houston [1st Dist.] 2005, pet.
denied) (stating that trial court's broad discretion in submitting jury questions is
subject to requirement that questions submitted fairly place disputed issues before
jury); First Nat'l Bank of Amarillo v. Jarnigan, 794 S.W.2d 54, 62 (Tex.
App.--Amarillo 1990, writ denied) (stating that "[a]n impermissible comment on the
weight of the evidence occurs, when after examining the entire charge, it is
determined that the judge assumed the truth of a material controverted fact, or
exaggerat[ed], minimiz[ed], or with[drew] some pertinent evidence from the jury's
consideration"); see also Tex. R. Civ. P. 277. 

 Moreover, because, in making these comments to the jury, the trial court
instructed the jury on the resolution of material, disputed issues of fact, we further
hold that the improper comments and jury question probably caused rendition of
improper judgment. Tex. R. App. P. 44.1(a)(1); see also In re D.R., 177 S.W.3d at
581, 584 (stating that error in jury charge is only reversible if it probably caused the
rendition of an improper judgment or probably prevented appellant from properly
presenting case on appeal). 

 We sustain Interconex's fourth issue in regard to its complaints that the trial
court erred in excluding its evidence contesting the causal link between its conduct
and Ugarov's damages, in informing the jury that Interconex had admitted that its
conduct caused Ugarov's inability to return to Russia and loss of a job opportunity,
and in overruling Interconex's objections to the trial court's sole question to the jury. (7)

Conclusion


 We reverse the judgment of the trial court and remand the case for a new trial
on damages and further proceedings consistent with this opinion.



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Alcala.



1. The jury trial was held in December 2004. Thus, the parties submitted Ugarov's
earnings in 2003 and 2004 as "past lost earnings" and Ugarov's earnings in 2005 as
"future lost earnings." Ugarov contends that, even though the initial term of the
Reforma job was three to five years, in order to be conservative, he only sought
damages for the first three years of the job and did not seek any possible bonus he
might have earned.
2. "Conclusory" is defined as "[e]xpressing a factual inference without stating the
underlying facts on which the inference is based." Black's Law Dictionary 284
(7th ed. 1999).
3. Although, like the trial court, we do not directly address whether a valid agreement
to arbitrate existed, we note that Interconex does not appear to be a signatory to the
agreement containing the arbitration provision. 
4. As noted above, after finding that Interconex had been properly served, the trial court
instructed Interconex to proceed with proving the Craddock elements. Initially, after
Interconex presented its evidence on the Craddock elements, the trial court found that
Interconex had met the first two Craddock elements, but was "still thinking" about the
third element. However, the trial court then expressly permitted Ugarov to address
the first Craddock element. After hearing additional argument from the parties
concerning whether Interconex's evidence satisfied all of the Craddock elements,
including extensive argument concerning the first Craddock element, the trial court
denied Interconex's motion to set aside default judgment. 
5. Interconex seeks to avoid the effect of the trial court's orders sustaining Ugarov's
objections to Tiongson's affidavit testimony by noting that the affidavit introduced
into evidence at the beginning of the hearing, which was labeled an "amended
affidavit," and the affidavit that was actually considered by the parties and the court
during the hearing, which was labeled a "second amended affidavit," are different
affidavits and, thus, Ugarov's objections applied only to the second amended affidavit
discussed during the hearing. We note that both the amended affidavit, which does
not appear to be attached to any document in the clerk's record, and the second
amended affidavit, which was attached to Interconex's amended motion for default
judgment filed on October 15, 2004, the day of the hearing, were both executed on
October 15, 2004 and that the testimony in both affidavits, at least as related to the
present issue, is substantively similar, except that the second amended affidavit
provides some additional detail. 
6. The supreme court also cited Texas Rule of Civil Procedure 243, which provides that
"[i]f the cause of action is unliquidated or be not proved by an instrument in writing,
the court shall hear evidence as to damages and shall render judgment therefor, unless
the defendant shall demand and be entitled to a trial by jury in which case the
judgment by default shall be noted, a writ of inquiry awarded, and the cause entered
on the jury docket." Tex. R. Civ. P. 243.
7. In light of these holdings, we need not address Interconex's complaints in its first and
fourth issues regarding factual sufficiency, the admission of evidence regarding
Ugarov's purported settlement agreement with Interconex, and the trial court's failure
to provide the jury instruction proffered by Interconex. See Tex. R. App. P. 47.1. We
also need not address Interconex's fifth issue regarding prejudgment interest. Id.