# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00423-CV

**Star Operations, Inc. and Great American Insurance Company of New York, Appellants**

**v.**

**Dig Tech, Inc., Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 22ND JUDICIAL DISTRICT
### NO. 12-0-337, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises out of a lower-tier subcontract related to a highway-construction project. Appellant Star Operations, Inc. was hired as a subcontractor by Central Texas Highway Constructors, the design-build contractor for the project, to build infrastructure for the illumination, signal, intelligent-transportation, and toll-collection systems as part of the construction of SH 130 toll-road Segments 5 and 6 southeast of Austin. Appellee Dig Tech, Inc. sued Star and its payment-bond surety, appellant Great American Insurance Company of New York, asserting that Star had breached an oral contract with Dig Tech. Dig Tech alleged that Star had hired it to perform some of the hole-boring work for the installation of electrical conduit needed for Star to complete its part of the construction project and that Star did not pay Dig Tech for the work it did. After a jury trial, the jury found in Dig Tech's favor and awarded Dig Tech the amount of its unpaid invoices, $228,524, and attorneys' fees. On appeal, Star and Great American Insurance raise fourteen issues

challenging the judgment.  For the reasons explained below, we will affirm the judgment in part, and we will reverse in part on the issue of court costs and remand the cause for further proceedings on that issue.

## BACKGROUND

The Texas Department of Transportation (TxDOT) entered into a facility concession agreement (FCA) with SH 130 Concession Company, the developer, for SH 130 Concession to finance and perform the construction of SH 130 toll-road Segments 5 and 6 southeast of Austin and to grant SH 130 Concession the concession to lease the sections and toll them for 50 years after the project's completion.[1]  *See generally* Tex. Transp. Code §§ 223.201-.209 (authorizing TxDOT to enter into public-private partnership agreements to facilitate private-sector investment and participation in development of state's transportation system).  SH 130 Concession hired Central

---

[1]  Star asserts that "it was undisputed and uncontroverted that the Project involved the use of federal funds."  We note that the record citations provided by Star include a citation to the section of TxDOT's agreement with SH 130 Concession that states "*[r]egardless of whether federal credit or funds are made available to Facility*, Developer shall comply and require its Contractors to comply with all federal requirements applicable to transportation projects that receive federal credit or funds, including those set forth in Exhibit 8."  (Emphasis added.)  The remainder of its record citations in support of this point are to Attachment 1 to Exhibit 8, which was attached to each of the parties' individual subcontracts with Central Texas.  That portion of the form attachment states: "The work herein proposed will be financed in whole or in part with Federal funds, and therefore all of the statutes, rules and regulations promulgated by the Federal Government and applicable to work financed in whole or in part with Federal funds will apply to such work."  No party has pointed us to any evidence in the record of the federal government's participation in or funding of the project outside of these record citations.  For purposes of this appeal, we will assume that the project received some unknown amount of federal funding because Dig Tech does not challenge Star's assertion.

Texas Highway Constructors as the design-build contractor on the project. As previously mentioned, Central Texas in turn hired Star as a subcontractor to build infrastructure for the illumination, signal, intelligent-transportation, and toll-collection systems. Star and Central Texas entered into two subcontracting agreements related to this work. As part of those agreements, Central Texas required Star to furnish a performance bond and a payment bond for each subcontract. Star's surety on the bonds is Great American. The payment bond at issue here provides that "Star Operations, Inc., as principal, . . . and Great American Insurance Company of New York, . . . as surety, . . . are held and firmly bound unto CENTRAL TEXAS HIGHWAY CONSTRUCTORS LLC as Obligee . . . for the use and benefit of Claimants as herein below defined in the amount of . . . $3,100,000.00 for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents."[2] Central Texas also

---

[2] There is no dispute that Dig Tech is a "claimant" as that term is defined in the bond. In their arguments about notice of the bond claim, however, Star and Great American allude to the fact that Dig Tech's May 1 notice letter only references one of the payment bonds and one of Star's subcontracts with Central Texas. When Dig Tech had not received payment from Star by late April, on April 23, 2012, Dig Tech's vice-president and owner Mike Furry requested "a copy of the contract" between Star and Central Texas and "a copy of your payment bond" from Lana Lewis, the president and founder of Star. Furry testified that he never received a copy of the contract from Lewis. Later correspondence among the various entities involved in the projects refers to both contracts and both bonds. The bond attached to the May 1 notice letter was admitted into evidence at trial. The judgment states that Great American "is obligated under the terms of its bond to make the payments that Star Operations failed to make," but does not specify the bond number. Star does not assert on appeal that the work performed by Dig Tech related only to one or the other of its subcontracts or that funds to pay the judgment are lacking under either bond. Because we have not been asked to determine whether both bonds applied to Dig Tech's work or whether the trial court's award refers to one or both bonds, we express no opinion and make no determination about whether the judgment applies to one or both bonds. For simplicity's sake, throughout this opinion, we will refer to the "bond," not the "bonds."

3

separately hired Dig Tech as a subcontractor responsible for relocating and adjusting electric-distribution facilities owned by Bluebonnet Electric Cooperative. The contract at issue in this case is an oral lower-tier subcontract that Star later entered into with Dig Tech for some hole-boring work for the installation of electrical conduit that Star needed done to complete its part of the construction project.[3]

Dig Tech completed the requested work and sought payment for it from Star. Dig Tech sent Star a letter on March 13, 2012, requesting payment for the invoices that had been submitted before that time and copied Central Texas on the letter. After inquiry from Central Texas to Star on Friday, March 16, Star informed Central Texas that the invoices were set up to be paid the following Tuesday. On April 12, Central Texas's project-controls manager, Michael Kiehnau, emailed Star's president and founder, Lana Lewis, to inform her that Dig Tech's vice-president and owner, Mike Furry, had called Kiehnau to let him know that Star had not contacted Dig Tech about payment, and consequently, Dig Tech would be filing a bond claim. Kiehnau told Lewis, "I urge you to resolve this issue immediately." On April 23, Furry requested that Lewis send him "a copy of the contract between Star [O]perations and [Central Texas]. Also, I would like you to provide me with a copy of your payment bond." Furry testified that he never received a copy of the contract from Lewis. On May 1, 2012, Dig Tech notified Star, Central Texas, and Great American of Dig Tech's

---

[3] Although Star refers to this contract in its briefing as the "purported oral contract," Star does not challenge the sufficiency of the evidence supporting the jury's verdict that "Dig Tech and Star Operations agree[d] that Dig Tech would conduct boring work for Star Operations, and that Star Operations would pay Dig Tech for such boring work."

claim via certified mail, return receipt requested, and further notified them that if all invoices were not paid in full, Dig Tech would file suit on the bond "on the 91st day after April 4, 2012, the last day on which Dig Tech's work or labor was done or performed."[4] Dig Tech subsequently filed suit against Star and Great American, alleging claims for breach of contract (express or implied), quantum meruit, and attorneys' fees.

After a ten-day trial, the jury found that Dig Tech and Star Operations had an agreement that Dig Tech would perform hole-boring work for Star and Star would pay for that work, but Star failed to comply with its agreement to pay and its failure to comply was unexcused.[5] The jury also found that although Dig Tech intentionally interfered with Star's subcontract with design-build contractor Central Texas, Dig Tech did so only because it had a good-faith belief that it had a right to threaten garnishment for the work it performed and any harm to Star did not result from any malice on the part of Dig Tech. The jury further found that Star, but not Dig Tech, had "unclean hands."

The jury awarded Dig Tech $228,524 for its unpaid work and also awarded attorneys' fees. The final judgment included an award of court costs, "including the cost of deposition

---

[4] The bond states: "Principal [Star] and Surety [Great American] hereby jointly and severally agree with the Obligee [Central Texas] that every Claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, may sue on this bond for the use of such Claimant, prosecute the suit to final judgment of such sum or sums as may be justly due Claimant, and have execution thereon. The Obligee [Central Texas] shall not be liable for payment of any costs or expenses of any such suit."

[5] The evidence at trial included e-mails stating a quote and proposed terms, start date, and projected duration of work, as well as evidence that the work was completed and accepted by Star.

5

transcripts and subpoenas necessarily obtained for use in this suit," pursuant to Texas Rule of Civil Procedure 131. The trial court also ordered in the judgment that "Dig Tech substantially complied with the notice provisions of the McGregor Act in order to perfect its bond claim against Great American Insurance," and accordingly, Great American "is obligated under the terms of its bond to make the payments that Star Operations failed to make." Star and Great American appeal from the judgment.

## ANALYSIS

Star and Great American challenge the judgment in fourteen issues. Seven issues flow from their contention that the trial court should have applied federal law to Dig Tech's contract claim. Issues eight through eleven concern the law related to Dig Tech's claim against the Great American payment bond and whether Dig Tech perfected its claim against the bond. In their twelfth issue, Star and Great American contend that the trial court erred by awarding damages to Dig Tech without any evidence of Dig Tech's actual damages as net loss after reduction of income-tax payments or unpaid income-tax liability, which they assert is required by Texas Civil Practice and Remedies Code Section 18.091. In issue thirteen, they challenge the trial court's award of attorneys' fees to Dig Tech based on their contention that Dig Tech failed to segregate recoverable attorneys' fees from unrecoverable attorneys' fees. In issue fourteen, Star and Great American argue that the trial court erred by awarding Dig Tech costs for copies of deposition transcripts as "taxable costs" when Dig Tech did not notice or initiate the depositions.

**Application of the *Christian* doctrine**

The first seven issues are related to Star and Great American's contention that the trial court should have applied a federal-law principle, the *Christian* doctrine, to Dig Tech's contract claim because the highway project was federally funded. Star and Great American assert that the *Christian* case stands for the proposition that when the subject matter of a contract is governed by valid federal regulations, the regulations are incorporated into the contract as a matter of law, even if the parties had not agreed to be bound by them. *See G. L. Christian & Assocs. v. United States*, 312 F.2d 418, 424-26 (Ct. Cl. 1963), *aff'd on reh'g*, 320 F.2d 345 (Ct. Cl. 1963) (denying contractor's breach-of-contract claim when government terminated construction contract for its own convenience even though contract lacked termination clause because court concluded that standard termination clause required by Armed Service Procurement Regulations must be read into contract). According to Star and Great American, applying the *Christian* doctrine in this case means that Dig Tech failed to comply with three conditions precedent. They contend that federal law required Dig Tech to obtain a written contract with Star and to obtain approval from TxDOT for the oral contract with Star as conditions precedent to formation of an enforceable contract. They further contend that federal law required Dig Tech to provide statutorily compliant certified payrolls as a condition precedent to any liability arising from Star's failure to pay Dig Tech, and that the payrolls provided by Dig Tech were not statutorily compliant based on errors in the classification or pay rate of approximately four employees in a one-week period. Therefore, they argue that the trial court erred by refusing to submit jury questions on (1) Dig Tech's alleged failure to obtain a written contract

7

with Star, (2) Dig Tech's alleged failure to obtain approval from TxDOT for the purported oral contract with Star, and (3) Dig Tech's alleged failure to provide statutorily compliant certified payrolls. They also argue that the trial court erred in awarding contract damages to Dig Tech based on their contention that Dig Tech's failure to satisfy these three conditions precedent renders the oral agreement that Dig Tech sued upon unenforceable by law. We first consider the effect of the *Christian* doctrine on Dig Tech's contract claim.

Under the *Christian* doctrine, which has been developed in a line of decisions from the Federal Circuit, "*a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy* is considered to be included in a contract by operation of law." *S.J. Amoroso Constr. Co., Inc. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (emphasis added) (citing *Christian*, 312 F.2d at 424, 427). The doctrine "echoes Supreme Court law that the United States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations," and its application "turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser [governmental] officials.'" *Id.* (quoting *Christian*, 320 F.2d at 351). "Thus, under the Christian Doctrine a court may insert a clause into a government contract by operation of law *if that clause is required* under applicable federal administrative regulations," so long as the clause "express[es] a significant or deeply ingrained strand of public procurement policy." *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) (emphasis added) (holding that Navy was entitled to reimbursement based on contractor's failure to maintain

8

material-handling charges in separate cost pool as required by regulatory payments clause incorporated into contract by operation of law). The *Christian* doctrine does not allow all mandatory contract clauses to be automatically incorporated by operation of law into a contract. *Id.* The doctrine is limited to those mandatory clauses expressing significant public procurement policy and to "less fundamental or significant mandatory procurement contract clauses if not written to benefit or protect the party seeking incorporation." *Id.* at 779-80.

Star and Great American contend that the *Christian* doctrine should be applied to incorporate into the alleged oral agreement between Star and Dig Tech all applicable federal regulations, but most specifically those regulations requiring (1) prior written consent of TxDOT to any subcontract, (2) a written contract between Star and Dig Tech, and (3) Dig Tech's provision of statutorily compliant certified payroll. *See* 23 C.F.R. § 635.116(b) (subcontractor and contractor responsibilities related to federally funded highway projects); 29 C.F.R. §§ 3.1-.11 (wage regulations for contractors and subcontractors on public building or work financed with federal funds). Star and Great American have not argued that these regulations "express a significant or deeply ingrained strand of public procurement policy." *See General Eng'g & Mach. Works*, 991 F.2d at 779. More importantly, however, none of the regulations that Star and Great American want to incorporate in the Dig Tech contract prescribe mandatory contract clauses like those incorporated into contracts under the *Christian* doctrine. *See, e.g.*, *Amoroso*, 12 F.3d at 1075 (applying *Christian* doctrine to construction contract to substitute mandatory clause of Buy American Act applicable to construction contracts by operation of law when contract had incorrectly included clause for nonappropriated fund

9

supply contracts); *Christian*, 312 F.2d at 424 (incorporating standard termination clause that regulation required to "be inserted in all fixed-price construction contracts amounting to more than $1,000").

Section 635.116 of Title 23 establishes requirements for entering into a subcontract on a federally funded highway project, but the regulation does not mandate that any specific clause be incorporated into the contract:

> The [state transportation department] shall not permit any of the contract work to be performed under a subcontract, unless such arrangement has been authorized by the [state transportation department] in writing. Prior to authorizing a subcontract, the [state transportation department] shall assure that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract. The Division Administrator [chief federal highway administration official for the particular state] may permit the [state transportation department] to satisfy the subcontract assurance requirements by concurrence in a [state transportation department] process which requires the contractor to certify that each subcontract arrangement will be in the form of a written agreement containing all the requirements and pertinent provisions of the prime contract. Prior to the Division Administrator's concurrence, the [state transportation department] must demonstrate that it has an acceptable plan for monitoring such certifications.

23 C.F.R. § 635.116(b). Similarly, Sections 3.3 and 3.4 of Title 29 require contractors and subcontractors engaged in construction of any federally funded public work to furnish weekly wage statements to the federal or state agency contracting for or financing the work and to keep payroll records reflecting the correct classification, rate of pay, hours worked, etc., for each worker, but those sections do not mandate the inclusion of any specific clause into the contract or subcontract

10

governing the work.[6] *See generally* 29 C.F.R. §§ 3.1-3.10 (prescribing anti-kickback regulations under Copeland Act and regulations intended to aid in enforcement of minimum-wage requirements); *see also id.* § 3.11 (requiring federally funded public-work contracts to expressly bind contractors or subcontractors to comply with applicable regulations, but not mandating inclusion of specific clause). Star and Great American seek to broaden the reach of the *Christian* doctrine, arguing not only that under the doctrine *all* applicable federal regulations should be incorporated into the subcontract between Dig Tech and Star, but also that those incorporated regulations should be read as implied conditions precedent to the formation or performance of the oral subcontract. We decline to extend the reach of the *Christian* doctrine in this manner. Based on this record, we conclude that the regulations relied upon by Star and Great American do not require the incorporation of any mandatory contract clauses under the *Christian* doctrine into the oral subcontract between Dig Tech and Star.

Star and Great American also argue, however, that the federal requirements were expressly incorporated into any and all contracts on the highway project, and thus would be incorporated into any subcontract between Dig Tech and Star. While Star and Great American are correct that the federal requirements were expressly incorporated into Central Texas's subcontracts

---

[6] Evidence was admitted at trial that Dig Tech submitted certified payroll records to Star for the twenty-six-week period that Dig Tech performed work for Star on the project. Star points to evidence in the record that four individuals were either misclassified or paid the wrong amount of hourly pay for their classification or both for at least one week that they worked and an instance in which two employees were listed incorrectly as being paid straight time when they had worked overtime in one week. Dig Tech responds by pointing to evidence in the record that Star never reviewed the certified payrolls that were submitted or notified Dig Tech of any compliance issues so that Dig Tech could correct them until after Dig Tech filed suit against Star.

with Star and with Dig Tech, as required by the FCA (the contract between TxDOT and SH 130 Concession Company),[7] the FCA also explicitly provides that those provisions "shall not be incorporated by reference in any case" in any lower-tier subcontracts.

"FCA Exhibit 8—Federal Requirements" is an attachment to Star's subcontracts with Central Texas and to Dig Tech's contract with Central Texas, and its Attachment 2 (titled "Required Contract Provisions Federal-Aid Construction Contracts") contains the following general provision:

> Except as otherwise provided for in each section, *the contractor [Central Texas] shall* insert in each subcontract all of the stipulations contained in these Required Contract Provisions, and *further require their inclusion in any lower tier subcontract* or purchase order that may in turn be made. *The Required Contract Provisions shall not be incorporated by reference in any case.* The prime contractor [Central Texas]

---

[7] The FCA provides:

> Developer [SH 130 Concession Company] shall comply and require its contractors to comply with all federal requirements applicable to transportation projects that receive federal credit or funds, including those set forth in Exhibit 8.

In FCA Section 10.2, concerning "Responsibility for Work, Contractors and Employees," the FCA further provides that:

> Each Contract shall include terms and conditions sufficient to ensure compliance by the Contractor with the requirements of the FCA Documents, and shall include those terms that are specifically required by the FCA Documents to be included therein including, to the extent applicable, those set forth in Exhibit 8.

Star's subcontracts with Central Texas and Dig Tech's subcontract with Central Texas expressly incorporate the entire FCA into those subcontracts:

> Facility Concession Agreement (FCA) is the agreement between the Developer [SH 130 Concession Company] and the Texas Department of Transportation. The FCA and related FCA documents are incorporated into this Subcontract Agreement.

shall be responsible for compliance by any subcontractor or lower tier subcontractor with these Required Contract provisions.[8]

(Emphases added.) Attachment 2's Section VII, "Subletting or Assigning the Contract," includes the following provision:

> No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the SHA [state highway authority] contracting officer [defined as TxDOT or its Authorized Representative], or authorized representative, and such consent when given shall not be construed to relieve the contractor [defined as Design-Build Contractor (Central Texas)] of any responsibility for the fulfillment of the contract. Written consent will be given only after the [state highway authority] has assured that each subcontract is evidenced in writing and that it contains all pertinent provisions and requirements of the prime contract.

In Section V, "Statements and Payrolls," Attachment 2 also incorporates by express reference the Copeland Act regulations found in 29 C.F.R. pt. 3 and includes the requirement of weekly submission of certified payroll statements, as provided in those regulations.

However, Star's subcontracts with Central Texas also include the following provision concerning lower-tier subcontracts:

> 9.4 SUBCONTRACTS. *Seller [Star Operations] shall not subcontract any Work . . . without the prior written consent of D&C Contractor [Central Texas]*, which consent shall not be unreasonably withheld or delayed. *Seller [Star] shall be solely responsible for the engagement* and management *of its Subcontractors* in the performance of the Work, for the performance of Work by its Subcontractors and *for all acts or omissions of Subcontractors.* Seller shall insure that all Work furnished or performed by Subcontractors conforms to the requirements of the Agreement Documents. Neither the consent by D&C Contractor, nor anything contained herein,

---

[8] Attachment 1 to Exhibit 8 establishes the following definitions for the required contract provisions included in Exhibit 8: "'contractor,' 'prime contractor,' 'bidder' or 'prospective primary participant' . . . shall be construed to mean the Design-Build Contractor or its authorized representative."

shall create any contractual relationship between any lower tier Subcontractor and D&C Contractor. *All lower-tier subcontracts must contain the terms and conditions that are incorporated in this Agreement.*

No Subcontractor is intended to be or shall be deemed to be a third party beneficiary of the Agreement. *Each agreement between Seller and any Subcontractor shall be in writing*, and shall be assignable to D&C Contractor upon the completion or termination of the Work. A copy of each such agreement with pricing removed shall be provided to D&C Contractor upon request.

*. . . . The Seller agrees that it is fully responsible to the D&C Contractor for the acts and omissions of its subcontractors . . . .*

(Emphases added.)

Construing all of these provisions together, we conclude that the parties' subcontracts *with Central Texas* expressly contained the federal requirements that were included as terms of the FCA. But nothing in the record indicates that the parties intended to incorporate those requirements into Star's oral contract with Dig Tech, and we have concluded that the *Christian* doctrine does not require their wholesale incorporation into that contract. In fact, the federal requirements themselves state that "[t]he Required Contract Provisions shall not be incorporated by reference in any case." We note that Section 9.4 of Star's contract with Central Texas explicitly places responsibility on Star for the engagement of any lower-tier subcontractors and the lower-tier subcontractor's acts and omissions. To the extent that Star's contract with Central Texas required any lower-tier subcontracts to be in writing and approved by TxDOT, it was the responsibility of Star, not the lower-tier subcontractor engaged by Star, to ensure compliance. In this case, Star seeks to use its own noncompliance with its subcontracts with Central Texas as a defense to enforcement of its oral contract with Dig Tech.

14

In essence, Star seeks to use promises it made to perform in its contract with Central Texas to create conditions precedent in Star's separate contract with Dig Tech. Conditions precedent are not favored in the law. When courts construe contracts, "forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible." *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) (citing *Schwarz-Jordan, Inc. of Hous. v. Delisle Constr. Co.*, 569 S.W.2d 878, 881 (Tex. 1978)). "A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. Conditions may, therefore, relate either to the formation of contracts or to liability under them." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976); *see also Rincones v. Windberg*, 705 S.W.2d 846, 848 (Tex. App.—Austin 1986, no writ) (distinguishing between condition precedent, which postpones effective date of instrument until happening of contingency, and condition subsequent, which refers to future event that excuses obligation to perform an already binding contract).

A condition precedent to formation occurs if the parties to a contract agree that it shall not become effective or binding until or unless some specified condition is performed or occurs. *See Perry v. Little*, 377 S.W.2d 765, 769 (Tex. Civ. App.—Tyler 1964, writ ref'd n.r.e.). "Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Hohenberg Bros.*, 537 S.W.2d at 3. When construing written contracts, although no particular words are required for the existence of a condition, terms such as "if," "provided that," or "on condition that," usually indicate an intent that the provision be a condition precedent rather than a promise. *Id.* To determine whether a condition precedent exists,

15

we must ascertain the intention of the parties by looking at the whole contract. *Criswell*, 792 S.W.2d at 948.

Courts look to the communications between the parties, as well as to the acts and circumstances surrounding their communications, when determining the existence and terms of an oral contract. *See Davis v. Chaparro*, 431 S.W.3d 717, 722 (Tex. App.—El Paso 2014, pet. denied) (holding evidence supported trial court's finding of meeting of minds to pay reasonable fee for services rendered based on parties' conversations). Star points to no evidence in the record, and we have found no evidence, that indicates the parties intended the agreement between Star and Dig Tech to become binding only after it was memorialized in a written contract and approved by TxDOT. Star's allegation that Dig Tech was required to submit statutorily compliant certified payroll to Star as a condition precedent to Star's obligation to pay Dig Tech for its work is likewise not supported by the evidence in the record. Although Dig Tech submitted a certified payroll report to Star each week during the period that it did work for Star, as required by federal regulations, there is no evidence of Star and Dig Tech communicating about making payment conditional on submission of statutorily compliant payroll before Dig Tech began its work, and the parties' actions afterward also support the conclusion that the parties had not agreed on such a condition. Star's human-resources and payroll director testified that she did not do anything with Dig Tech's certified payroll statements except electronically store them in a computer file; Star never forwarded the certified payroll statements to Central Texas; Star's president testified that she never reviewed the payroll statements before Dig Tech filed suit or discussed any classifications in the payroll statements with her employees or Dig Tech; and Star's president never told Dig Tech that one of the reasons Star refused to pay is because of any mistake or error in the payroll statements or provided Dig Tech with an

16

opportunity to correct the errors that Star asserts are in some of the certified payroll statements. Furthermore, Star's president admitted that Star refused to pay Dig Tech before she had ever reviewed Dig Tech's certified payroll statements. We conclude that the parties never agreed that these three federal requirements should be conditions precedent to their agreement that Dig Tech would perform hole-boring work for Star.

We overrule Star's first seven issues. The trial court correctly concluded as a matter of law that the *Christian* doctrine did not require the incorporation of the three federal requirements propounded by Star into Star's subcontract with Dig Tech. While those three requirements were express provisions of Star's contracts with Central Texas and Dig Tech's contracts with Central Texas, they were not incorporated into Star's oral subcontract with Dig Tech. Star and Dig Tech did not agree to make them conditions precedent to the formation or enforceability of Star's subcontract with Dig Tech. Accordingly, the trial court did not err by refusing to submit proposed jury questions on the lack of a written contract, the lack of TxDOT approval of the oral contract, or Dig Tech's alleged failure to provide statutorily compliant certified payroll statements. Likewise, because the three federal requirements were not conditions precedent to the formation of an enforceable contract, the trial court did not err by awarding Dig Tech contract damages.

**Dig Tech's claim against the Great American payment bond**

In issues eight through eleven, Star and Great American challenge the trial court's application of the law to Dig Tech's claim against the payment bond. Star and Great American assert that the federal Miller Act applies to the project, and therefore, federal courts have exclusive subject-matter jurisdiction over the bond dispute. Alternatively, if the Texas McGregor Act applies, Star and Great American assert that the evidence at trial showed that Dig Tech failed to comply with

17

that Act's notice requirements and thus failed to perfect its bond claim as a matter of law.  Star and

Great American consequently challenge the trial court's ruling as a matter of law that Dig Tech

perfected its bond claim, the trial court's denial of Great American's motion for instructed verdict

and of Star and Great American's motion for judgment notwithstanding the verdict, and the trial

court's refusal to submit Great American's proposed jury questions on whether Dig Tech

substantially complied with the McGregor Act's notice requirements.

**Miller Act v. McGregor Act**

We first consider whether the Miller Act applies to Dig Tech's bond claim.[9]  The

Miller Act requires bonds to be issued as follows:

> **(b)**    **Type of bonds required.--**Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, *a person must furnish to the Government* the following bonds, which become binding when the contract is awarded:
>
> > **(1)**    **Performance bond.--***A performance bond* with a surety satisfactory to the officer awarding the contract, and in an amount the officer considers adequate, *for the protection of the Government.*
> >
> > **(2)**    **Payment bond.--***A payment bond* with a surety satisfactory to the officer *for the protection of all persons supplying labor and material in carrying out the work provided for in the contract* for the use of each person. The amount of the payment bond shall equal the total amount payable by the terms of the contract unless the officer awarding the contract determines, in a writing supported by specific findings, that a payment bond in that amount is impractical, in which case the contracting officer shall set the amount of the payment bond.

---

[9] Star and Great American raised this issue in a plea to the jurisdiction, in Great American's motion for directed verdict, and in Star and Great American's motion for judgment notwithstanding the verdict; none of these motions were granted.

18

> The amount of the payment bond shall not be less than the amount of the performance bond.

40 U.S.C. § 3131(b) (italics added). Article 7 of the contracts between Central Texas and Star required Star to provide both a performance bond and a payment bond each in an amount equal to the full contract price on forms attached to the contracts. The bond at issue in this case is the payment bond issued by Star and Great American on behalf of Central Texas. The "Subcontract Labor and Material Payment Bond" that Star and Great American executed is a payment bond provided for the use and benefit of claimants who furnish labor or materials required for use in the performance of Star's contract with Central Texas. The bond provides that Star, Great American, and Central Texas agree that claimants not timely paid in full may sue on the bond "in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere."

Star and Great American argue that the Miller Act requires contractors on "public work" projects to provide performance and payment bonds and that this highway project is a public work because it is a federally funded project for the purpose of creating a roadway for public use. Star relies on a Fifth Circuit case, *Continental Casualty Co. v. C.O. Brand, Inc.*, for the proposition that "a 'public work' within the Miller Act is 'any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds.'" 355 F.2d 969, 974 (5th Cir. 1966) (quoting *Peterson v. United States ex rel. Marsh Lumber Co.*, 119 F.2d 145, 147 (6th Cir. 1941)). In *Continental Casualty*, the court was not considering whether to apply either the Miller Act or a state act requiring bonds in a construction project. The issue in

19

that case was whether the notice provision of the Miller Act requiring notice only to the prime

contractor or the dual-notice provision of the Capeheart Military Housing Act requiring notice to any

two of the prime contractor, any one of the obligees, and the surety should apply in a suit on a

Capeheart Act bond. *Id.* at 970. In making the statement quoted by Star, the court was disagreeing

with the Tenth Circuit's holding that Capeheart Act housing projects are not "public works" within

the meaning of the Miller Act. *Id.* at 974.

In a more recent case deciding whether the Miller Act should apply to a company's

bonds issued for various "public-works contracts" entered into with Arizona state and municipal

entities, including highway construction with funding from the Federal Highway Administration, the

Ninth Circuit upheld the district court's determination that the projects were not "public works of

the United States." *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*,

135 F.3d 671, 675-76 (9th Cir. 1998). The court explained that:

> Although there is no clear test for designating a project a "public work of the United
> States," courts often look to the following as indicia: whether the United States is a
> contracting party, an obligee to the bond, an initiator or ultimate operator of the
> project; whether the work is done on property belonging to the United States; or
> whether the bonds are issued under the Miller Act.[10]

---

[10] Star relies on two cases that it asserts stand for the proposition that the Miller Act applies
to "public works," even if the United States does not own the real estate, is not a party to the
construction contract, and is not an obligee on the bond. *See Roth Bros., Inc. v. Ohio Farmers Ins.
Co.*, 1:12-CV-0158-JMS-DKL, 2012 WL 2120013 (S.D. Ind. June 11, 2012) (order denying motion
to dismiss); *Sullivan v. Faras-RLS Grp., Ltd.*, 795 F. Supp. 305 (D. Ariz. 1992). Both are
distinguishable from the facts in this case. In *Sullivan*, the project was initiated by the United States
Postal Service, funded entirely with federal funds through the United States Bureau of Indian Affairs,
built to Postal Service specifications and federal construction-project standards, "located on a
'federal Indian reservation,'" and leased to the federal government for twenty years. *Sullivan*,
795 F. Supp. at 306. When concluding the Miller Act applied to the post-office project, the court
distinguished the project at issue from another case in part because the state highway project in the
other case, like the project at issue in this case, was only partially federally funded, was not built for

*Id.* at 675. The court concluded that all those indicia were absent in the case before it, and in addition, that JWJ Contracting as principal and Continental Insurance as its surety were unlikely to have issued the bonds in the sum total amount payable under the contract terms as required by state law when they could have issued them for half that amount under the terms of the Miller Act then in effect. *Id.* at 675-76. Moreover, the court determined that the bonds were not "furnished to the United States" or "for the protection of the United States," as required by the Miller Act. *Id.* at 676; *see also* 40 U.S.C. § 3131(b).

        In this case, the United States or an agency of the United States or a person acting as the agent of the United States did not contract for the work at issue. *See United States ex rel. Miller v. Mattingly Bridge Co.*, 344 F. Supp. 459, 461 (W.D. Ky. 1972) (holding that Miller Act applies only in these situations based on its construction of word "contracts" as covering only contracts between United States and prime contractor, not contracts to which United States was not a party). The bond here was issued on the contract between Star, as subcontractor, and Central Texas, as prime contractor. Star does not contend that either of these parties was acting as an agent of the United States. In addition, the United States government is not an initiator or ultimate operator of the project, and the work was not done on property belonging to the United States. *See Operating Eng'rs*, 135 F.3d at 675-76. The property is not intended to be leased to any agency of the United States government, and "the project [is] to benefit the people of [Texas] and not the general public of the United States." *See Sullivan v. Faras-RLS Grp., Ltd.*, 795 F. Supp. 305, 307 (D. Ariz. 1992).

---

leasing to the United States, and "was to benefit the people of [the state] and not the general public of the United States." *Id.* at 307. Similarly, the bond claim at issue in *Roth Brothers* involved a building project for a building to be leased to the federal government and used for the FBI. 2012 WL 2120013, at *1-2.

Furthermore, the Miller Act specifically requires that the payment bond be furnished to the United States government. 40 U.S.C. § 3131(b). The contract between Central Texas and Star required that the bond be furnished to Central Texas, and there is no evidence in the record showing that the bond at issue was furnished to the United States, rather than Central Texas, or that the United States was also an obligee on the bond. *See United States ex rel. Tri-State Road Boring, Inc. v. United States Fid. & Guar. Co.,* 959 F. Supp. 345, 347 (E.D. La. 1996) (holding subcontractor's payment bond on contract for construction of airport control tower was not Miller Act bond because it was not furnished to United States). In addition, the form of the bond itself provided that suit may be brought in state court or federal court where the project is situated, providing another indication that the parties did not intend for the bond to be construed as a Miller Act bond, because federal courts have exclusive subject-matter jurisdiction over Miller Act claims. *See United States ex rel. Harvey Gulf Int'l Marine, Inc. v. Maryland Cas. Co.,* 573 F.2d 245, 247 (5th Cir. 1978) (noting federal courts' exclusive jurisdiction over Miller Act claims). For all these reasons, we conclude that the bond was not issued on a contract governed by the Miller Act.

We conclude that the trial court correctly decided as a matter of law that the Miller Act did not deprive it of subject-matter jurisdiction over Dig Tech's suit seeking payment on the bond. We overrule Star and Great American's eighth issue.

**Application of the McGregor Act**

Star and Great American argue in the alternative that if the McGregor Act applies to Dig Tech's claim against the bond, the trial court erred by ruling as a matter of law that Dig Tech perfected its claim. At trial, evidence was admitted showing that Dig Tech provided notice to Star, Central Texas, and Great American of its claim on the payment bond that Central Texas required

22

Star to furnish as part of the subcontracts between Central Texas and Star. Star and Great American challenge the effectiveness of Dig Tech's notice to Central Texas and to Great American. At the close of Dig Tech's case, Great American moved for directed verdict on the notice issues, which it had previously raised in defendants' plea to the jurisdiction. Great American argued that Dig Tech never gave notice to the "prime contractor," as that term is defined in the Act, and never gave sworn notice to Great American, as required by the Act. The trial court denied Great American's motion. Later in trial, during the charge conference, Dig Tech asked the trial court for an order that "Dig Tech has substantially complied with the notice provisions such that [Great American] has notice of our bond claim." The trial judge stated that he was not submitting that issue to the jury and "essentially that's exactly what's happened here. . . . I've agreed not to submit this to the jury as a fact question — as a matter of law[,] I'm making that determination . . . ."

Star and Great American contend that this was error because Dig Tech failed to comply in two ways with the Act's notice provisions. First, they assert that the Act required Dig Tech to provide notice to the "prime contractor" of its claim, and that as the Act defines "prime contractor," the prime contractor in this case was SH 130 Concession. *See* Tex. Gov't Code §§ 2253.001 (defining "prime contractor" as "a person, firm, or corporation that makes a public work contract with a governmental entity"), .041 (establishing notice to prime contractor and surety required from payment-bond beneficiary for payment claim), .047 (establishing additional notice required from payment-bond beneficiary without direct contractual relationship with prime contractor). Second, they assert that Dig Tech never provided a sworn statement of account to Great American that complied with the requirements of Section 2253.041.

23

The Texas Legislature passed the McGregor Act to create a method to ensure that subcontractors and suppliers on public-works projects are paid for their labor and materials because they generally may not place liens against public buildings or other public works. *See Dealers Elec. Supply Co. v. Scroggins Constr. Co.*, 292 S.W.3d 650, 653 (Tex. 2009); *Featherlite Bldg. Prods. Corp. v. Constructors Unlimited, Inc.*, 714 S.W.2d 68, 69 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also City of LaPorte v. Taylor*, 836 S.W.2d 829, 831 (Tex. App.—Houston [1st Dist.] 1992, no writ) (explaining that "[g]enerally, in construction contracts, in the absence of an express agreement to the contrary, a subcontractor is not in privity with the owner and must look to the general contractor alone for payment, while the owner is liable for payment only to the general contractor," but subcontractor's normal remedy is to assert mechanic's lien).  The Act (1) requires a prime contractor who makes a contract with a governmental entity to secure a payment bond from a surety and execute it to the governmental entity, (2) allows a subcontractor or supplier to "sue the principal and surety, jointly or severally, on the payment bond" for unpaid balances for work and materials, and (3) allows for the award of reasonable attorneys' fees.  Tex. Gov't Code §§ 2253.021 (mandating that governmental entity making public-work contract with prime contractor must require contractor to execute payment and performance bonds to governmental entity), .073 (allowing payment-bond beneficiary to sue principal or surety, jointly or severally, on payment bond), .074 (allowing reasonable and equitable attorneys' fees); *see also United Fire & Cas. Co. v. Boring & Tunneling Co. of Am.*, 321 S.W.3d 24, 27 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  The Act was not intended to set up "technical tricks, traps, and stumbling blocks to the filing of legitimate notices of claims," but "to provide a simple and direct method of giving notice and

24

perfecting claims." *Argee Corp. v. Solis*, 932 S.W.2d 39, 52-53 (Tex. App.—Beaumont 1995), *rev'd on other grounds sub nom. Green Int'l Inc. v. Solis*, 951 S.W.2d 384 (Tex. 1997).

The McGregor Act is remedial in nature and "should be liberally construed to achieve its purposes." *Dealers Elec. Supply Co.*, 292 S.W.3d at 653-54 (citing *Featherlite*, 714 S.W.2d at 69 (The Act "is to be given the most comprehensive and liberal construction possible.")). Consequently, while courts typically find that parties must strictly comply with notification deadlines, only substantial compliance is required for other notice provisions. *Compare Suretec Ins. Co. v. Myrex Indus.*, 232 S.W.3d 811, 815-16 (Tex. App.—Beaumont 2007, pet. denied) (determining that Code Construction Act did not apply to extend deadline to mail notice to Monday when 15th of month falls on Sunday because McGregor Act requires claimants to mail notice on or before 15th of month, "a specific and clear deadline"); *Commercial Union Ins. Co. v. Spaw-Glass Corp.*, 877 S.W.2d 538, 540 (Tex. App.—Austin 1994, writ denied) (holding that surety could not recover from prime contractor for surety's payment made to claimants because surety's payment to supplier claimants was not required under McGregor Act when claimants had not notified prime contractor of claims before prime contractor released retention payment to subcontractor who did not pay suppliers) *with e.g.*, *Boring & Tunneling Co.*, 321 S.W.3d at 28-29 (holding as matter of law that notice lacking notary signature and seal was not deficient when evidence presented that omission was clerical error, statement was sworn, corrected statement was sent, and surety had timely actual notice); *Capitol Indem. Corp. v. Kirby Rest. Equip. & Chem. Supply Co.,* 170 S.W.3d 144, 147-48 (Tex. App.—San Antonio 2005, pet. denied) (holding as matter of law that sworn statement that did not precisely comport with statutory language substantially complied with statutory requirements); *Acme Brick, a Div. of Justin Indus., Inc. v. Temple Assocs.*, 816 S.W.2d 440, 441 (Tex. App.—Waco

25

1991, writ denied) (holding as matter of law that claimant's notice with affiant's signature in incorrect place on sworn statement substantially complied with Act even if it was not valid affidavit); *Featherlite*, 714 S.W.2d at 69-70 (holding as matter of law that exact language of notice provision not required in sworn statement in case in which surety and contractor did not dispute that Featherlite supplied materials or amount of claim); *United States Fid. & Guar. Co. v. Parker Bros. & Co.*, 437 S.W.2d 880, 881-82 (Tex. Civ. App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.) (holding as a matter of law that claimant substantially complied with notice provisions by sending sworn statements to prime contractor even though copies sent to surety were unsworn). Substantial compliance has been defined as satisfaction of the "essential requirements of a statute" and occurs when an actor's deviation does not seriously impede the legislative purpose of the statutory requirements. *See Stratton v. Austin Indep. Sch. Dist.*, 8 S.W.3d 26, 30 (Tex. App.—Austin 1999, no pet.).

Star and Great American argue that their complaints about Dig Tech's notice are analogous to the issues in cases holding that untimely notification does not substantially comply with the McGregor Act. *See, e.g.*, *Suretec,* 232 S.W.3d at 815-16; *Laboratory Design & Equip., Inc. v. Brooks Dev. Auth.*, No. 04-07-00284-CV, 2008 WL 36614, at *3 (Tex. App.—San Antonio Jan. 2, 2008, no pet.) (mem. op.) (holding as matter of law that notice mailed over one year late without sworn statement prevented subcontractor from recovering against payment bond). The substance of Star and Great American's issues with Dig Tech's notice, however, is not that the notice was untimely. Instead, they argue that Great American never received the sworn statement required to be delivered with notice of the claim and that Dig Tech did not serve the proper party as prime contractor.

26

We first address Star and Great American's argument that Great American never received the sworn statement required to be delivered with notice of the claim because our disposition of that issue aids in our resolution of the other notice issue. Dig Tech's counsel sent Great American a letter via certified mail on May 1, 2012 (with return receipt signed May 7), informing Great American that the law firm represented Dig Tech in its claim for unpaid amounts due based on labor and materials provided to Star on the SH 130 Segments 5 and 6 project. The letter advised Great American that no payments at all had been made to Dig Tech, and accordingly, suit would be filed on the bond "on the 91st day after April 4, 2012, the last day on which Dig Tech's work or labor was done or performed, if all invoices have not been paid in full by that time." The letter further advised Great American that all invoices and claims for payment had previously been sent to Star and that "the invoices and descriptions of work" were copied and enclosed with the letter. Great American does not dispute that the invoices and descriptions were attached to the letter. Great American also does not assert that the amount claimed was later materially amended.

While notice is a substantive condition precedent to a party's ability to pursue a claim on a bond, numerous courts have liberally construed the requirement that written notice of a claim "must be accompanied by a sworn statement of account that states *in substance*: (1) the amount claimed is just and correct; and (2) all just and lawful offsets, payments, and credits known to the affiant have been allowed." Tex. Gov't Code § 2253.041(c) (emphasis added); *see also, e.g.*, *Boring & Tunneling Co.*, 321 S.W.3d at 28-29 (First Court of Appeals); *Kirby Rest. Equip.*, 170 S.W.3d at 147-48 (Fourth Court of Appeals); *Acme Brick*, 816 S.W.2d at 441 (Tenth Court of Appeals); *Featherlite*, 714 S.W.2d at 69-70 (Fourteenth Court of Appeals); *Parker Bros. & Co.*, 437 S.W.2d at 881-82 (First Court of Appeals). Dig Tech's letter indicated that it was presenting a claim for

27

"unpaid amounts due" for work completed for Star. This type of language has been deemed sufficient to inform the surety in substance that the amount claimed is "just and correct" and that "all just and lawful offsets, payments, and credits known to the affiant have been allowed." *See Kirby Rest. Equip.*, 170 S.W.3d at 148 & n.2. Great American also contends that because no sworn statement accompanied the notice, Dig Tech failed to perfect its claim, relying on *Laboratory Design*. *See* 2008 WL 36614, at *3 (holding claimant who mailed notice over one year after statutory deadline without including sworn statement did not substantially comply with statutory requirements). The opinion in that case describes an earlier letter informing the governmental authority (acting as surety) of the amount owed, but it does not provide any description of the later letter filed over a year after the deadline that the claimant argued substantially complied with the statutory requirements. *See id.* at *1 (describing June 3, 2004 letter), *3 (identifying letter mailed June 15, 2005, as letter relied on to establish notice of claim). Consequently, it is unclear what, if any, similarity the notice letter in that case has to the notice letter in this case. In addition, the court in *Laboratory Design* does not appear to have been presented with the issue of actual notice, which also makes it distinguishable from the facts here.

In this case, Dig Tech presented evidence at trial supporting its contention that its notice to Great American substantially complied with the McGregor Act and that Great American had actual notice of Dig Tech's claim. Substantial compliance occurs "'when an actor's deviation from compliance [with the essential requirements of a statute] does not seriously impede the legislative purpose of the statute,' that is, when actual notice of the claims are provided." *Dudley Constr., Ltd. v. Act Pipe & Supply, Inc.*, ___ S.W.3d ___, 06-15-00045-CV, 2016 WL 3917211, at *9 (Tex. App.—Texarkana July 14, 2016, pet. granted) (quoting *Boring & Tunneling Co.*,

28

321 S.W.3d at 28, and holding sufficient evidence to support finding of substantial compliance when entity's former name was used on notices to prime contractor but actual notice was received). In this case, Dig Tech's May 1 letter sent via certified mail to Great American and the May 9 letter from Central Texas to Star claimed an amount due based on the invoices included in the claim that was substantially the same as the amount Dig Tech sought at trial and was awarded. In addition, two other documents admitted at trial support Dig Tech's claim that Great American had actual notice of the claim. The first document is a May 18, 2012 email from Star's president to a Star employee, which states "Anthony - Please forward me any email correspondence you have concerning Dig Tech. *I need to respond and coordinate with our attorney and surety*. Please send today as this has been escalated." (Emphasis added.) The second document is a February 1, 2013 letter from Star's president presenting a formal prompt-payment complaint against Central Texas. In that letter, Star's president states the following: "Dig Tech has asserted NO CLAIMS against [Central Texas]. *Dig Tech asserted claims against STAR <u>back in May 2012</u> and <u>filed notice on STAR'S BOND</u>* furnished for the benefit of [Central Texas]. Star provided payment and performance bonds to [Central Texas] for both subcontract agreements . . . . Central Texas has no contractual reason to withhold funds claimed by Dig Tech." (Italics added.)

The legislative purpose of the McGregor Act "is to protect claimants who supply labor and material in the construction of public works, and to provide a simple and direct method of giving notice and perfecting claims." *Argee*, 932 S.W.2d at 52-53. The evident purpose of the Act's requirement that a claimant accompany its written notice of a claim to a surety with a sworn statement is to provide the surety with true and accurate information about the amount of the claim, so that the surety may prepare to defend against the claim. On this record, Dig Tech's deviation from

the Act's requirement to include a sworn statement has not seriously hindered the legislature's purpose in imposing the sworn-statement requirement because Great American had actual notice of true and accurate information about the amount of the claim. *See Stratton*, 8 S.W.3d at 31. Actual notice to the surety constitutes substantial compliance with the notice requirements. *See Dudley Constr., Ltd.*, ___ S.W.3d ___, 2016 WL 3917211, at *9.

Similarly, on this record, we conclude that Dig Tech's provision of actual notice to both Star, the principal and obligor on the bond, and Great American, the surety, constitutes substantial compliance with the Act's requirement that the claimant notify the prime contractor and surety. *See* Tex. Gov't Code §§ 2253.041, .047. As an initial matter, Star and Great American fail to explain why lack of notice to SH 130 Concession should preclude Dig Tech from recovery on the bond, when Dig Tech notified the three parties named on the bond—the obligee, Central Texas; the principal and obligor, Star; and the surety, Great American. *See Redland Ins. Co. v. Southwest Stainless, L.P.*, 181 S.W.3d 509, 512-13 (Tex. App.—Fort Worth 2005, no pet.) (holding subcontractor's failure to send notice of claim to prime contractor via certified mail did not preclude subcontractor from recovery on bond when surety received actual notice that complied with statutory requirements); *see also Argee Corp.*, 932 S.W.2d at 53 ("We do not perceive the legislative purpose behind the McGregor Act to be that of creating technical tricks, traps and stumbling blocks to the filing of legitimate notices of claims.").

Moreover, the only payment bond required under the Act is the bond that the governmental entity requires the prime contractor to obtain. Tex. Gov't Code § 2253.021(a)(2), (c). On that bond, the governmental entity is the obligee, while the prime contractor is the principal and obligor who is liable and who may be sued jointly and severally with its surety by a payment-bond

30

beneficiary if a claim is not paid. In contrast, on the bond at issue in this case, Central Texas is the obligee, while Star is the principal and obligor who is liable and who may be sued jointly and severally with Great American, its surety, if a claim is not paid. The parties do not dispute that Dig Tech is a payment-bond beneficiary of Great American's bond, which was provided by Star for the protection of Cental Texas, the obligee named in the bond, from claims by subcontractors and suppliers.

The McGregor Act contemplates projects that are more simply structured than the project at issue here. The Act requires a governmental entity that makes a public-work contract with a prime contractor to require the contractor to execute payment and performance bonds in favor of the governmental entity before work begins. Tex. Gov't Code § 2253.021(a). The performance bond protects the state or governmental entity, *id.* § 2253.021(b), while the payment bond protects "payment bond beneficiaries who have a direct contractual relationship with the prime contractor or a subcontractor to supply public work labor or material," *id.* § 2253.021(c)(1). The Act does not mandate that subcontractors on a public-work project obtain payment bonds. In this case, the SH 130 Segments 5 and 6 construction project was governed by a comprehensive development agreement (CDA) involving multiple contracts, including the Facility Concession Agreement entered into by TxDOT and SH 130 Concession Company.[11] *See generally* Tex. Transp. Code §§ 223.201-.209 (authorizing TxDOT to enter into CDAs). As part of that agreement, TxDOT

---

[11] That agreement explains that TxDOT entered into the CDA with Cintra-Zachry, LP and that the CDA contemplated that Cintra-Zachry or one of its affiliates (i.e., SH 130 Concession Company) may enter into agreements for development of one or more transportation facilities, including SH 130 Segments 5 and 6. Central Texas's project-controls manager explained at trial that his employer was actually Zachry Construction Corporation because Central Texas was a special-purpose entity created by Zachry Construction Corporation for the purpose of designing and constructing the SH 130 Segments 5 and 6.

required SH 130 Concession Company to obtain payment and performance bonds. SH 130 Concession Company, as developer on the project, then entered into an agreement with Central Texas for Central Texas to design and build the SH 130 Segments 5 and 6. Central Texas, in turn, entered into subcontracts with various subcontractors and suppliers, including Star. Central Texas contractually required Star to obtain its own payment and performance bonds. Given the complex structure of the CDA and its chain of contracts under which each subcontractor is contractually required to obtain its own payment bonds, essentially stepping into the shoes of a prime contractor vis-à-vis its lower-tier subcontractor, Dig Tech's notice to Central Texas, Star, and Great American comports with the overarching purpose of the McGregor Act.

The Act also requires a payment-bond beneficiary to give notice to the prime contractor of both unpaid claims and the amount of any retainage applicable to the account that has not become due under the terms of the agreement between the prime contractor or a subcontractor and the payment-bond beneficiary. *Id.* § 2253.041(a), (d). The purpose of these notice requirements is "to protect the prime contractor from incurring double liability," which could happen in the past before the legislature added the notice provisions to the statute, if a contractor paid a subcontractor in full and then later found a claim presented against it from someone who dealt only with the subcontractor. *Spaw-Glass Corp.*, 877 S.W.2d at 540. In this particular case, the record indicates that SH 130 Concession was the party who had a contract with the governmental entity (i.e., the "prime contractor" as defined by the Act), but that SH 130 Concession bore no risk of liability to Dig Tech, much less a risk of double liability. Under the terms of the bond, Star and Great American bound themselves to Central Texas as obligee "for the use and benefit of Claimants" in the amount of $3.1 million for payment for labor and material required for the performance of Star's subcontract

32

with Central Texas. Both Star, as principal, and Great American, as surety, received actual notice

of Dig Tech's claim. *See* Tex. Gov't Code § 2253.73 (allowing payment-bond beneficiary to "sue

the principal or surety, jointly or severally on the payment bond" for unpaid claim); *Dealers Elec.*

*Supply Co.*, 292 S.W.3d at 660 (holding that McGregor Act provides "mandatory and exclusive

remedy against a surety and obligor on a public-work payment bond" issued under the Act). On this

record, we must give the statute "the most comprehensive and liberal construction possible" to

accomplish the remedial purpose of the Act.[12] *See Dealers Elec. Supply Co.*, 292 S.W.3d at 659

(holding McGregor Act's overarching purpose is "to protect unpaid laborers and materialmen by

providing them an additional funding source—a payment bond—in the event the prime contractor

fails to meet its obligations"); *Featherlite*, 714 S.W.2d at 69. Under the circumstances presented

---

[12] Although no party has raised this issue, it is questionable whether the McGregor Act should apply to the contractually required bond at issue in this case. The only payment bond required under the Act is one that a governmental entity requires a prime contractor to execute to the governmental entity before beginning the work. Tex. Gov't Code § 2253.021; *see also Johnson Serv. Co. v. Cinbar Eng'g Co.*, 409 S.W.2d 471, 473 (Tex. Civ. App.—Austin 1966, no writ) (holding that subcontractor's bond to subcontractor was not required under McGregor Act because "[i]f the bond in suit is not a bond required by any statute, it is not a statutory bond; it is a common law bond" (citing *Metropolitan Cas. Ins. Co. of New York v. Texas Sand & Gravel Co.*, 68 S.W.2d 551, 552 (Tex. Civ. App.—Waco 1934, writ dism'd)). While the McGregor Act is a subcontractor or supplier's "mandatory and exclusive remedy against a surety and obligor on a public-work payment bond" issued under the Act, "that exclusivity does not extend beyond suit against the [McGregor Act] bond itself" to preclude other statutory or common-law remedies. *Dealers Elec. Supply Co. v. Scroggins Constr. Co.*, 292 S.W.3d 650, 659-60 (Tex. 2009). As stated, the parties proceeded at trial and on appeal as if the McGregor Act must apply if the Miller Act does not and have not raised the issue of the Act's applicability. The bond itself contains no specific notice requirements, meaning that if the McGregor Act does not apply, Dig Tech was not required to provide notice of its claim at any particular time or in any particular form before suit. *See Johnson Serv. Co.*, 409 S.W.2d at 474 (holding that because McGregor Act did not apply, claimant's case against surety must be determined only by bond's terms, not any McGregor Act provisions). As a result, whether we analyze Dig Tech's claim against the bond under the McGregor Act or as a common-law contractual obligation, we conclude the trial court did not err by determining that Dig Tech perfected its bond claim against Great American.

33

here, Dig Tech's deviation from the Act's requirement to provide the prime contractor with notice has not seriously hindered the legislature's purpose because Star as principal and Great American as surety on the bond both had actual notice of true and accurate information about the amount of the claim before suit was filed against them.[13]   *See* Tex. Gov't Code § 2253.073 (allowing payment-bond beneficiary to "sue the principal or surety, jointly or severally, on the payment bond"); *Stratton*, 8 S.W.3d at 31.  Based on the specific facts before us, this actual notice to the parties who were liable on the bond constitutes substantial compliance.  *See also Dudley Constr., Ltd.*, ___ S.W.3d ___, 2016 WL 3917211, at *9.  Releasing Great American from its liability on the bond because SH 130 Concession—who was not a party to the bond and who has no potential liability related to the bond—did not receive notice (and does not complain of its lack of notice) of the bond claim would be contrary to the purpose of the statutory scheme and create an absurd result.  *See FKM P'ship, Ltd. v. Board of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 633 (Tex. 2008) ("We use definitions prescribed by the Legislature . . . but otherwise, we construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results.").

Having determined that Dig Tech's actual notice to Central Texas, Star, and Great American substantially complies with the McGregor's Act notice requirements, we conclude that

---

[13] Star and Great American also allude to the fact that Dig Tech only references one of Star's subcontracts and bonds in its May 1 letter, implying that therefore Great American had insufficient notice that both subcontracts and bonds were at issue.  We note that before sending its notice, Dig Tech requested that Star send it a copy of Star's contract with Central Texas and its bond.  Dig Tech's vice-president Mike Furry testified that Star's president never sent him the contract.  It is unclear from the record how Dig Tech eventually obtained any information about Star's contracts and bonds, but this information was in Star's possession, not Dig Tech's.  This is the sort of technical trap that the McGregor Act aims to prevent.

34

the trial court did not err by ruling that Dig Tech perfected its claim against the bond. Therefore, the trial court did not err by denying Great American's motion for directed verdict and defendants' motion for judgment notwithstanding the verdict or by refusing to submit Great American's proposed jury questions on Dig Tech's substantial compliance with the McGregor Act's notice requirements. We overrule Star and Great American's issues nine through eleven.

**Application of Texas Civil Practice and Remedies Code Section 18.091**

In their twelfth issue, Star and Great American assert that the trial court erred in awarding damages to Dig Tech without any evidence of Dig Tech's actual damages presented in the form of a net loss after reduction for income-tax payments or unpaid income-tax liability, which they contend is required by Texas Civil Practice and Remedies Code Section 18.091. Section 18.091 states:

> § 18.091. Proof of Certain Losses; Jury Instruction
>
> (a)    Notwithstanding any other law, if any claimant seeks recovery for loss of earnings, loss of earning capacity, loss of contributions of a pecuniary value, or loss of inheritance, evidence to prove the loss must be presented in the form of a net loss after reduction for income tax payments or unpaid tax liability pursuant to any federal income tax law.
>
> (b)    If any claimant seeks recovery for loss of earnings, loss of earning capacity, loss of contributions of a pecuniary value, or loss of inheritance, the court shall instruct the jury as to whether any recovery for compensatory damages sought by the claimant is subject to federal or state income taxes.

Tex. Civ. Prac. & Rem. Code § 18.091. Star and Great American's argument focuses on the "loss of earnings" category in Subsection (a) and they make no assertion that the other three categories would be applicable to this case. Star and Great American reason that since Dig Tech's invoices

would result in ordinary revenue, they constitute "earnings" within the meaning of the Internal Revenue Code and federal income tax would be duly owed by Dig Tech. Consequently, Star and Great American assert that Dig Tech's failure to present net-of-taxes evidence precludes its recovery at trial.

In support of their assertion that Section 18.091 requires Dig Tech to prove net-of-taxes damages in this case, Star and Great American rely on *Interconex, Inc. v. Ugarov*, 224 S.W.3d 523 (Tex. App.—Houston [1st Dist.] 2007, no pet.) and *Big Bird Tree Service v. Gallegos*, 365 S.W.3d 173, 179 (Tex. App.—Dallas 2012, pet. denied). As a preliminary matter, neither of those cases stand for the specific proposition advanced by Star and Great American. In *Interconex*, there was a jury trial on the sole issue of damages, following a default judgment on liability claims of breach of contract, negligence, and defamation. 224 S.W.3d at 527-28. The only elements of damages submitted to the jury were past and future lost earnings. *Id.* at 530. On appeal, Interconex asserted that the plaintiff failed to comply with the net-of-taxes requirement of Section 18.091, but the court found that such issue was waived and therefore it did not address the net-of-taxes requirement, nor did it expressly or tacitly approve the application of Section 18.091 in a breach-of-contract case. *Id.* at 532-33.

In *Gallegos*, an employee brought a negligence action against his employer, seeking damages for lost earning capacity resulting from an on-the-job injury. 365 S.W.3d at 175. The employee testified to pre-tax wages without objection and the court's ultimate analysis came down to the sufficiency of the evidence supporting the jury's award of lost earning capacity in the past and in the future. *Id.* at 178-79. The case specifically involved damages resulting from a personal injury

and there was no discussion of the application of Section 18.091 to other types of damages such as contract damages.

In their briefing, the parties advance differing views of whether Section 18.091 applies to this type of case. A review of the pleadings, evidence, charge, and judgment in this case indicates that this is a breach-of-contract case as opposed to a case involving damages resulting from a personal injury rendering a party unable to work.[14] Star and Great American argue that the language of Section 18.091 is broad and is not expressly limited to personal-injury cases. Dig Tech counters that Section 18.091 applies only to personal-injury cases, not contract cases, because damages received in a breach-of-contract case are taxable, and application of the section would effectively result in double taxation on such contract plaintiffs.

Our inquiry starts with the language of the statute. Both Subsection (a) and (b) contain the phrase "if any claimant seeks recovery for . . ." preceding the types of losses that must be presented in the form of net of taxes. This language expressly points the analysis to the type of damages sought to be recovered, rather than the type of liability claims (contract or personal injury) in question. The liability claims are still relevant, however, because different liability claims result in different types of damages. Here, Dig Tech sought recovery of breach-of-contract damages from Star based on the amount of the unpaid invoices in question. After the evidence closed, the jury was charged with fairly standard breach-of-contract jury questions asking whether Dig Tech and Star had an agreement, whether Star failed to comply with the agreement, and whether Star's failure to comply was excused by Dig Tech's failure to comply with a material obligation of the same

---

[14] Dig Tech also requested and received quantum meruit questions included in the charge but because the jury answered "Yes" to Question 1 (existence of a contract), the jury was instructed not to answer those questions.

37

agreement. Ultimately, the jury was asked the damages question conditioned on a finding of Star's failure to comply. Question 4 of the charge (the damages question) reads as follows:

### Question 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dig Tech for its damages, if any, that resulted from Star Operations' failure to comply?

Consider the following elements of damages, if any, and none other.

The reasonable value of the work performed by Dig Tech at the time and place it was performed.

Answer in Dollars and Cents, if any.

Answer: _____

Dig Tech did not seek recovery of "loss of earnings" as that phrase is typically used in the Texas Pattern Jury Charge and Texas case law, nor was the jury charged to assess such an element of damages. The cases on loss of earnings tend to center on the burden of proof and distinguishing loss of earnings from loss-of-earning capacity. *See Strauss v. Continental Airlines, Inc.*, 67 S.W.3d 428, 435-43 (Tex. App.—Houston [14th Dist.] 2002, no pet.). However, the parties have cited no cases, and we have found none, that allow a corporation such as Dig Tech to recover loss of earnings as a measure of damages following the breach of an agreement. The cases in which this measure of damages is sought to be recovered are generally personal-injury cases. The Internal Revenue Code authorizes compensation received on account of personal injuries or sickness to be excluded from gross income. 26 U.S.C. § 104(a)(2). "Presumably, the purpose of [Section 18.091] is to prevent a plaintiff from obtaining a windfall by being awarded pretax income on awards that are not subject to taxation." *Gallegos*, 365 S.W.3d at 179.

38

In contrast, a corporation such as Dig Tech would be required to report breach-of-contract damages from a court award as ordinary income. Internal Revenue Service, U.S. Dep't of the Treasury, Pub. No. 525, Taxable and Nontaxable Income: For Use in Preparing 2016 Returns 29 (2017), https://www.irs.gov/pub/irs-pdf/p525.pdf. Furthermore, Dig Tech did not seek recovery of loss of earnings, and the evidence did not demonstrate that it lost earnings or suffered a loss of the opportunity or ability to obtain earnings. Instead, Dig Tech failed to receive its benefit of the bargain—payment—after it had performed the work. Based on the facts of the business dispute presented by this case, Star and Great American's assertion would require us to stretch the interpretation of Section 18.091 to fit a category of damages to which it seemingly was not intended to apply and in which there is no discernable potential for a plaintiff to obtain a windfall of tax-free damages. We decline to do so. Accordingly, we overrule Star and Great American's issue twelve.

**Dig Tech's attorneys' fees award**

In their thirteenth issue, Star and Great American assert that the trial court erred in awarding attorneys' fees to Dig Tech because Dig Tech failed to segregate recoverable attorneys' fees from unrecoverable attorneys' fees. In support of this argument, Star and Great American cite *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006). However, we need not address this issue. Star and Great American offered no objection to the attorneys' fees question—Question No. 9—during the charge conference. Consequently, Star and Great American did not specifically object to the attorneys' fees question on the ground that it failed to segregate recoverable fees from unrecoverable fees. *See* Tex. R. Civ. P. 272, 274. Accordingly, Star and Great American failed to preserve error on this issue. *See* Tex. R. App. P. 33.1; *see Young v. Neatherlin*, 102 S.W.3d 415, 420

(Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he Texas Supreme Court has held that error is preserved by an objection to the jury charge on the ground that the charge did not properly segregate attorney's fees." (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991)).

**Taxable costs**

In their fourteenth and final issue, Star and Great American assert that the trial court erred in awarding Dig Tech costs for copies of deposition transcripts as "taxable costs" when Dig Tech did not notice or initiate the depositions in question. Whether a particular expense is recoverable under a statute or rule as court costs is a question of law, which we review de novo. *Gumpert v. ABF Freight Sys., Inc.*, 312 S.W.3d 237, 239 (Tex. App.—Dallas 2010, no pet.). The allocation of costs is a matter for the trial court's discretion and cannot be overturned on appeal absent an abuse of discretion. *Id.* at 239.

Texas Civil Practice and Remedies Code Section 31.007 provides in pertinent part:

(b)     A judge of any court may include in any order or judgment all costs, including the following:

(1)     fees of the clerk and service fees due the county;

(2)     fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit;

(3)     masters, interpreters, and guardians ad litem appointed pursuant to these rules and state statutes; and

(4)     such other costs and fees as may be permitted by these rules and state statutes.

Tex. Civ. Prac. & Rem. Code § 31.007(b). Relevant here is Subsection (b)(2), which allows the "fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in

40

the suit" to be included as costs awarded in the judgment. The dispute here focuses not on whether the seven deposition transcripts in question were necessarily obtained for use in the suit but on whether Dig Tech could recover costs for obtaining copies of those deposition transcripts when it did not notice or initiate the depositions, and thus it was only paying for the copies, as opposed to paying the court reporter's fee for the original transcript. Section 31.007(b)(2) specifically allows recovery of the court reporter's fee for the original stenographic transcript as a taxable court cost. We agree with the reasoning of our sister court in *Gumpert*. In that case, the court concluded that Section 31.007(b) specifically limits recovery of costs to the fees of the court reporter for the original of stenographic transcripts necessarily obtained for use in the suit and that because no other statute or rule authorizes the recovery of costs to obtain copies of deposition transcripts, it was error to award such costs. *Id.* at 241-42; *see also Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, No. 03-10-00826-CV, 2014 WL 6705741, at *4 (Tex. App.—Austin Nov. 14, 2014, no pet.) (mem. op.) (following *Gumpert* and holding that costs for video depositions or copies of depositions or transcripts are not recoverable as court costs).

Similarly in this case, we conclude it was error for the trial court to award the costs of obtaining copies of deposition transcripts, and we sustain Star and Great American's fourteenth issue. Accordingly, we will reverse that portion of the trial court's judgment relating to court costs and remand this cause for further proceedings to allow the trial court the opportunity to recalculate the taxable costs.

**CONCLUSION**

We reverse that portion of the trial court's judgment relating to court costs for obtaining copies of deposition transcripts, and we remand the case to the trial court for further

41

proceedings consistent with this opinion.  As to all other trial-court rulings challenged by Star and Great American, we affirm.

_____

Cindy Olson Bourland, Justice

Before Chief Justice Rose, Justices Pemberton and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed:   July 27, 2017